(627 P.2d 367)
No. 51,933

Ron Musil, *Appellant,* v. John Hendrich, *Appellee.*

Opinion filed May 1, 1981.

*Paul R. Shepherd,* of Deines & Wagner, of WaKeeney, for appellant.

*Selby S. Soward,* of Goodland, for appellee.

Before Justice Prager, presiding, Abbott, J., and J. Patrick Brazil, District Judge, assigned.

Brazil, J.: This is an appeal from a jury verdict for the defendant, John Hendrich. Plaintiff, Ron Musil, filed suit claiming a violation of the Kansas Consumer Protection Act, a breach of implied warranty of merchantability under the Uniform Commercial Code, and fraud due to the suppression of material facts relating to the sale of feeder pigs. At the close of plaintiff's case,

the court ruled on a motion for directed verdict that as a matter of law, the Kansas Consumer Protection Act (KCPA) did not apply to the facts of this case. At the end of all the evidence, the court directed a verdict against plaintiff on the basis that the Uniform Commercial Code (UCC) also did not apply. The case was submitted to the jury on the fraud theory; the verdict was for defendant Hendrich, and plaintiff Musil appeals.

This case involves the sale of feeder pigs by defendant Hendrich to Musil. Both men were hog farmers, raising the hogs for sale as well as fattening some for slaughter. They both raised pigs and both also purchased pigs. Hendrich had been in the business, off and on, for from 30 to 40 years; Musil had been in the business for approximately 13 years. Musil lived in Goodland, Kansas, and Hendrich lived one-and-a-half miles north of Goodland.

On September 21, 1977, Hendrich approached Musil at the sale barn in Burlington, Colorado, and told him that he had some feeder pigs for sale. Musil agreed to look at the pigs. The two men had not met prior to this, but Hendrich had observed Musil buying feeder pigs at the sale. On September 22 or 23, Musil came to Hendrich's place, and after looking at the feeder pigs he bought 60 head of them. The pigs weighed approximately 30 pounds per head.

The pigs appeared healthy, although a few did have dysentery. Musil noticed this, but he seemed unconcerned. Hendrich told Musil during the inspection that he fed the pigs a medicated feed. Musil told Hendrich that he had been a hog feeder for a long time and knew what to do with hogs.

After two weeks, Musil noticed that some of the feeder pigs appeared wobbly. Soon, several of them died. A veterinarian was consulted and medication prescribed. In the next month, Musil lost nearly 60 hogs, some from the feeder pigs purchased from Hendrich and the rest from his general hog population. A post-mortem examination done at Kansas State University revealed that the pigs were infected with swine dysentery, pneumonia, atrophic rhinitis and whipworm parasitism, all fairly common swine ailments. Experts testified that all these ailments, if successfully treated, would not affect the merchantability of the hogs. After the post-mortem, Musil contacted Hendrich about the sick hogs and asked him to make reparation. Hendrich refused and this suit followed.

Musil first contends that under K.S.A. 50-626 Hendrich committed a deceptive act by intentionally concealing the fact that the hogs were diseased. He also alleges a violation of K.S.A. 50-627 in that Hendrich committed an unconscionable act under that section.

The pertinent portion of K.S.A. 50-626 states:

"(a) No supplier shall engage in any deceptive act or practice in connection with a consumer transaction.

"(b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act:

. . . .

"(3) [T]he intentional failure to state a material fact or the intentional concealment, suppression or omission of a material fact, whether or not any person has in fact been misled."

The pertinent portion of K.S.A. 50-627 states:

"(a) No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction.

"(b) The unconscionability of an act or practice is a question for the court. In determining whether an act or practice is unconscionable, the court shall consider circumstances of which the supplier knew or had reason to know, such as, but not limited to the following:

. . . .

"(3) [T]hat when the consumer transaction was entered into, the consumer was unable to receive a material benefit from the subject of the transaction."

The trial court ruled that the transaction was not covered by the KCPA, apparently for the reason it felt that the plaintiff would not be considered a consumer under the definition included in that act. The judge further commented that both parties here were people who had been in the business of raising hogs; and that he considered the KCPA to be designed to protect those persons dealing in products, services and things for which they are not accountable for any knowledge.

Based upon the trial court's holding, we first look at some of the definitions and comments in the KCPA. The relevant definitions seem to be "agricultural purposes," "consumer," "consumer transaction," and "supplier."

According to K.S.A. 50-624, the definition section of the KCPA, those terms are defined as follows:

"(a) 'Agricultural purpose' means a purpose related to the production, harvest, exhibition, marketing, transportation, processing or manufacture of agricultural products by a natural person who cultivates, plants, propagates or nurtures the

agricultural products. 'Agricultural products' includes agricultural, horticultural, viticultural, and dairy products, *livestock,* wildlife, poultry, bees, forest products, fish and shellfish, and any products thereof, including processed and manufactured products, and any and all products raised or produced on farms and any processed or manufactured products thereof.

"(b) 'Consumer' means an individual who seeks or acquires property or services for personal, family, household, business or *agricultural purposes.*

"(c) 'Consumer transaction' means a *sale,* lease, assignment or other disposition for value of property or services within this state . . . to a consumer or a solicitation by a supplier with respect to any of these dispositions.

. . . .

"(i) 'Supplier' means a manufacturer, distributor, dealer, *seller,* lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in, or enforces consumer transactions, whether or not he or she deals directly with the consumer." (Emphasis added.)

The Kansas comments to K.S.A. 50-624 are useful in understanding the scope of these definitions. For instance, the comment to subsection (*a*) says:

"Though the definition of 'agricultural products' is broad, the operative definition is 'agricultural purpose' and this is narrowed by the requirement that the person dealing with the agricultural products be one who cultivates, plants, propagates, or nurtures the agricultural products. *Agricultural transactions are generally covered by this* act, except with respect to home solicitation sales." (Emphasis added.)

The comment to subsection (*b*) is even more instructive:

"This definition of 'consumer' is intentionally broad. It covers not only individuals who seek or acquire goods, services or real estate for personal, family or household purposes, but *also sole proprietors such as farmers* and business people." (Emphasis added.)

A reading of the above definitions and comments makes it clear, in our opinion, that the sale of these pigs was a transaction covered by the KCPA. Ron Musil, as the buyer, was clearly buying pigs for "agricultural purposes" as that term is defined in K.S.A. 50-624(*a*). For purposes of the act, Musil does seem to be a "consumer" as that term is defined by K.S.A. 50-624(*b*) and the comment to (*b*). And Hendrich, as the seller, seems to fit the definition of "supplier" in K.S.A. 50-624(*i*). And the whole transaction can be characterized as a "consumer transaction" under K.S.A. 50-624(*c*).

Notwithstanding our finding that the trial court erred in ruling that the KCPA did not cover this transaction, we nevertheless conclude that evidence, or lack of it, supported his directed

verdict at the close of the plaintiff's evidence. Both parties here were experienced pig farmers; both were experienced in the buying and selling of hogs. Musil was not the typical consumer who was at a disadvantage in dealing with Hendrich. The bargaining positions of the two parties were equal, and this was an arm's length transaction with no evidence of coercive solicitation. Examination of the record shows that there was insufficient evidence to support a claim of deceptive practice or of an unconscionable act under the KCPA.

Expert testimony revealed that the propensity for dysentery is present in most hogs and that the condition can be triggered by transporting hogs from one place to another, by exposure to inclement weather, or by a change in feed. Experienced hog farmers expected to lose a certain percentage of any group of hogs due to disease.

Dysentery was evident in some of the hogs at the time of the sale, and Musil noticed it. No attempt was made to hide the condition from him. In his own testimony about the sale, Musil admitted that Hendrich had mentioned that the hogs had been fed a medicated feed, a fact that would have put Musil on notice that some disease—probably the dysentery—was present in the hogs.

Testimony showed that Musil exposed the hogs to a blustery wind in transporting them to his lots, and that he did not continue feeding them medicated feed. All of those stresses could have contributed to the onset of the problems with the hogs.

The other conditions diagnosed in the Kansas State University post-mortem were common swine ailments, many of which were impossible to detect in live pigs. Of the three dead pigs examined at K-State, only one could be traced definitely to the group purchased from Hendrich. The other two were from Musil's own hog population. There was insufficient evidence to support a finding of a deceptive practice. K.S.A. 50-626.

As to the claim of an unconscionable act (K.S.A. 50-627), Musil claims that at the time the transaction was entered into, he was unable to receive a "material benefit" from the hogs (K.S.A. 50-627[3]). This claim is not substantiated in the record; there is no evidence that Musil did not receive a material benefit from the feeder hogs that survived and, furthermore, there is no evidence

that at the time of the sale Hendrich *knew* that the hogs would die. Such knowledge is required by K.S.A. 50-627.

Even though the ruling of the trial court was based upon an erroneous theory, the end result is the same. The judgment of a trial court, if correct, is to be upheld even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision. *Farmers State Bank v. Cooper,* 227 Kan. 547, 556, 608 P.2d 929 (1980).

At the close of all the evidence, the trial court granted the defendant's motion for a directed verdict on the breach of implied warranty. Plaintiff contends the trial court erred in deciding that this case was not covered by the UCC provisions on implied warranty of merchantability (K.S.A. 84-2-314). As with the ruling on the applicability of the KCPA, the trial court looked at the nature of the transaction and the experience of both parties and concluded that the UCC was not applicable.

Although the trial court did not explain the basis for holding that the UCC was inapplicable to this case, both parties assume the basis to be *Decatur Cooperative Association v. Urban,* 219 Kan. 171, 547 P.2d 323 (1976). In that case, the Supreme Court held that a farmer who sold his yearly grain crop to a grain elevator was not a "merchant" for the purposes of the UCC statute of frauds provision. Musil would distinguish the farmer in *Decatur,* who sells only the grain he raises, from Hendrich, who raises hogs for market and for sale to other hog raisers. Hendrich argues that *Decatur* should be read to say that a farmer is not a merchant for any UCC purpose in Kansas. He cites cases from other jurisdictions that have gone both ways on whether a farmer is a merchant.

The critical part of the *Decatur* opinion follows a section setting out the provisions and comments to K.S.A. 84-2-104:

"From the foregoing it appears there are three separate criteria for determining merchant status. A merchant is (1) a dealer who deals in the goods of the kind involved, or (2) one who by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction, even though he may not actually have such knowledge, or (3) a principal who employs an agent, broker or other intermediary who by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction (see 1 Anderson, UCC, 2d ed., § 2-104:4, p. 220). Professionalism, special knowledge and commercial experience are to be used in determining whether a person in a particular situation is to be held to the standards of a merchant." 219 Kan. at 176-77.

The trial court did not set out or apply the three criteria for determining merchant status, but if Musil's claim is to be properly considered on appeal, Hendrich's status must be evaluated.

Under the first criterion, the court would have to decide if Hendrich is a dealer who deals in goods of the kind involved—in this case, hogs. By Hendrich's own testimony, he had been in the hog business for 30 to 40 years and at the time of the sale to Musil, Hendrich was selling from 50 to 100 pigs per month. There is no doubt that Hendrich was a dealer in hogs.

The second criterion is that a merchant is one who by his *occupation* holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction. It is clear from the testimony that hog raising was Hendrich's occupation. He testified that in 1977 he had about 60 sows, raised over 1000 pigs, had equipment, buildings and an employee, all of which were used in the hog raising operation; that he supplied a slaughter house in Goodland, sold hogs at other sale barns and made other private sales. It seems that Hendrich meets the second standard to qualify as a merchant.

The third criterion does not seem to apply to this case, because Hendrich acted alone, without an agent, in the transaction with Musil.

Using these *Decatur* standards, and emphasizing the other language in that opinion on professionalism, special knowledge, and commercial experience, we conclude that the trial court erred in ruling that Hendrich was not a merchant under the provision of the UCC.

Again, however, as with the questions pertaining to the KCPA, we find there was insufficient evidence to hold that the warranty of merchantability had been breached. We believe that Musil failed to establish what is "merchantability" in the sale of feeder pigs (K.S.A. 84-2-314[2][a], and [c]); that Musil as the buyer had the burden of establishing the breach (K.S.A. 84-2-607[4]); that the trial court did not err in finding as a matter of law that Musil had failed to meet this burden.

There is little testimony in the record to suggest what "merchantability" means in the sale of feeder pigs. Two veterinarians testified that the ailments suffered by these pigs were common ones and ordinarily would not affect their marketability. The record disclosed that these pigs met the ordinary description of

feeder pigs—that is, pigs of a certain size and weight. Hendrich and his employee testified that the pigs sold to Musil were some of the best pigs they had ever raised.

Plaintiff's final issue on appeal is his claim that the court's instruction on fraudulent suppression was an erroneous statement of the law.

The trial court gave an amended version of PIK Civ. 2d 14.40 (1977). The offending portions of the instruction are as follows:

"2. That the parties suppressing said facts did so recklessly and knowingly or with reason to know.

"3. That the suppression of said facts was intentionally done for the purpose of inducing another party to act."

Plaintiff argues that no definition of "recklessly" was given to the jury so it could evaluate defendant's conduct in suppressing the fact that the hogs were diseased; and that requiring plaintiff to prove that Hendrich acted "recklessly" was "overly burdensome" to plaintiff. Musil argues that requiring proof "that the suppression of said facts was intentionally done for the purpose of inducing another party to act" added an erroneous additional element to the instruction.

Musil's objection to the instruction given at trial was a general objection only. In evaluating such a general objection, the appellate court need decide only if the instruction was "clearly erroneous." *Mesecher v. Cropp,* 213 Kan. 695, 702, 518 P.2d 504 (1974); *Coleman v. Brotherhood State Bank,* 3 Kan. App. 2d 162, 166, 592 P.2d 103 (1979). A more complete statement of the appellate standard of review appears in *State v. Stafford,* 223 Kan. 62, 65, 573 P.2d 970 (1977), where the court states that "[a]n instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict."

When applied to the facts of this case, it does not appear that the instruction was clearly erroneous or that a different instruction would have resulted in a different verdict. The testimony of Musil himself was that he had noticed some of the hogs had dysentery at the time of the sale, and that Hendrich had said something about medicated feed. Both of these statements could have led the jury to conclude that there was no fraudulent suppression of material facts. If no material facts were sup-

pressed, the argument on "reckless" suppression is irrelevant; the argument on the suppression inducing Musil to buy the hogs also fails with this analysis.

Affirmed.