No. 54,015

Amy Jo Allman and Shane Alan Allman, by and through their next friend and guardian, Milton R. Watters, and Milton R. Watters, individually, and as Executor of the Estate of Linda Allman, deceased, *Appellants,* v. James F. Holleman, Jr., Rolando R. Mesina, John B. Cotter, and Emergency Physicians, Inc., a professional corporation, *Appellees.*

(667 P.2d 296)

Opinion filed July 15, 1983.

*Dwight A. Corrin,* of Michaud, Cordry, Michaud, Hutton & Hutton, Chartered, of Wichita, argued the cause and *Richard D. Cordry,* of the same firm, was with him on the briefs for the appellants.

*Darrell L. Havener,* of Watson, Ess, Marshall & Enggas, of Kansas City, Missouri, argued the cause and *John J. Bukaty, Sr.,* of Bukaty & Bukaty, of Kansas City, Kansas, was with him on the brief for appellees James F. Holleman, Jr. and Rolando R. Mesina.

*Ronald C. Newman,* of Mustain & Newman, Chartered, of Kansas City, Kansas,

argued the cause and was on the brief for appellees John B. Cotter and Emergency Physicians, Inc.

The opinion of the court was delivered by

HERD, J.: This is an appeal from a jury verdict in a medical malpractice action.

Linda Allman was a 28-year-old widow and the mother of two children. In an effort to control her weight she consulted James F. Holleman, Jr., an osteopathic physician. At the time of the initial consultation, April 2, 1975, Linda was taking Ovulen-21, a birth control pill. She informed Dr. Holleman she also had taken tranquilizers and was taking thyroid medication. She reported she suffered from sluggishness, shortness of breath, and frequent headaches. Dr. Holleman placed her on a weight reduction program in which she would return to his office every week to be weighed and given a vitamin injection. This procedure was performed by a nurse. Every fourth week Linda would be examined by Dr. Holleman.

Linda saw Dr. Holleman again on April 30 and May 28. The weight reduction program appeared to be working. During the May 28th visit, however, Linda complained of being nervous. Dr. Holleman noticed she had a slightly elevated pulse rate. He placed her on stronger tranquilizers to try and control her anxiety.

After May 28, 1975, Linda stopped coming to Dr. Holleman's office for her weekly visits. She did not see Dr. Holleman personally until July 7, 1975, approximately one week later than her scheduled appointment. During the July 7 visit she related to Dr. Holleman she was suffering from chest pains so sharp they made her cry. She also complained of pain and tenderness in the stomach area. The chest pains had been present for approximately two weeks; the stomach discomfort had increased over the previous four days. However, she indicated there had been no recent trauma to the abdominal area. Finally, she reported two instances of dark stools.

That same day, July 7, 1975, Ms. Allman was admitted to Providence-St. Margaret Hospital for diagnostic tests. Although Dr. Holleman felt the tests could have been performed on an outpatient basis, Ms. Allman insisted on admission to the hospital. Dr. Holleman commenced tests and Rolando R. Mesina, a medical doctor employed by Dr. Holleman, was called in for

consultation after which Dr. Mesina undertook the primary care of Ms. Allman. After several days of tests, on July 13, 1975, Dr. Mesina performed an abdominal paracentesis and found blood in the abdominal cavity. Exploratory surgery was performed and a ruptured spleen was discovered and removed. After surgery, the patient was transferred to the intensive care unit. By the following morning, July 14, 1975, Ms. Allman had developed pulmonary edema, a condition in which the lung tissue retains too much fluid causing the patient to have respiratory problems. Dr. Sherman Zaremski was contacted in consultation and he intubated Ms. Allman with an endotracheal tube, a device placed through the throat and vocal cords into the trachea. This tube was then connected to a ventilator which assisted Ms. Allman's respiration.

During the afternoon of July 16, 1975, Ms. Allman struggled against the discomfort of the endotracheal tube. At about 6:40 p.m. that evening she succeeded in dislodging the tube. Dr. John Cotter was then called from the hospital emergency room. He reinserted the tube. After making sure everything was satisfactory Dr. Cotter returned to the emergency room. Shortly thereafter the tube became dislodged again. This discovery was made by Dr. Michael Boggan as he walked by Linda's room after seeing one of his patients. She was cyanotic and had a slow heart rate. Dr. Boggan was too late. His efforts to revive Ms. Allman were unsuccessful and she died.

This action was brought on behalf of Amy and Shane Allman, minor children of Linda Allman, by their grandfather and guardian, Milton Watters, for the alleged wrongful death of their mother. Mr. Watters, as executor of the estate of Linda Allman, also brought his own action for the conscious pain and suffering of the decedent. The total amount of damages sought was $775,000. Initial defendants included Doctors Holleman, Mesina, Cotter and Zaremski; two anesthesiologists; a nurse anesthetist and "Anesthesiology Chartered"; Providence-St. Margaret Health Center; Emergency Physicians, Inc.; and G. D. Searle and Company, the makers of Ovulen-21. The nurse anesthetist was dismissed; the anesthesiologists and "Anesthesiology Chartered" settled for $40,000; Providence-St. Margaret Health Center settled for $65,000; G. D. Searle and Company settled for $10,000; and Dr. Zaremski settled for $40,000.

Trial lasted from September 14 to 30, 1981. The jury found the total amount of damages sustained by the plaintiffs was $150,000. Fault was apportioned as follows:

a. Dr. James F. Holleman, Jr. and
   Dr. Rolando Mesina.......................... 11%
b. Dr. John B. Cotter and Emergency
   Physicians, Inc. ............................ 0%
c. Linda Allman.............................. 40%
d. Providence-St. Margaret Health Center......... 49%
e. Dr. Sherman C. Zaremski ................... 0%
f. Dr. Archibald O. Tetzlaff.................... 0%
g. Searle & Company.......................... 0%

Plaintiffs appeal.

Appellants first argue the trial court erred in submitting the fault of Linda Allman to the jury. The trial court instructed the jury on the appellants' theory of the case. They alleged appellees Holleman and Mesina were negligent in the following respects.

"1. In failing to timely diagnose the extensive free abdominal bleeding of Linda Allman;

"2. In failing to do blood volume studies on Linda Allman;

"3. In failing to timely perform the abdominal paracentesis on Linda Allman;

"4. An undue delay in doing surgical exploration on Linda Allman;

"5. In failing to obtain timely medical consultation of a diagnostician or internal medicine physician."

The jury was also instructed on the appellants' allegations that Dr. Cotter was negligent in the manner in which he reinserted the endotracheal tube after Linda Allman had dislodged it. Then, over appellants' objection, the trial court instructed the jury as follows:

"The defendants deny they were at fault and that they exercised the standard of care required under the circumstances. Defendants further claim that if the plaintiffs sustained damage or injury, it was the fault of Linda Allman in one or more of the following respects:

"(1) The taking of Ovulen 21 birth control pills;

"(2) Failing to give a complete and accurate medical history;

"(3) Delay in seeking medical attention for the condition for which she was hospitalized and/or the condition from which she ultimately died;

"(4) Attempting to remove the endotracheal tube, removal of the endotracheal tube and/or causing loosening or removal of the endotracheal tube.

"The defendants have the burden of proof that their claims are more probably true than not true."

It is undisputed a party is entitled to an instruction explaining his theory of the case where evidence is introduced in support thereof. *Shawnee Township Fire District v. Morgan,* 221 Kan. 271, 277, 559 P.2d 1141 (1977). An appellate court's task is to determine whether, when considered as a whole, the jury instructions properly and fairly state the law as applied to the facts of the case. If they do, and if the jury could not reasonably be misled by them, the instructions should be approved on appeal. *Bechard v. Concrete Mix & Construction Inc.,* 218 Kan. 597, 601, 545 P.2d 334 (1976). See also *Timsah v. General Motors Corp.,* 225 Kan. 305, 315, 591 P.2d 154 (1979). The controversy here is over the question of whether evidence was introduced which tended to show Linda Allman was negligent.

"Negligence," as the trial court instructed the jury, "is the lack of ordinary care. It is the failure of a person to do something that an ordinary person would do, or the act of a person in doing something that an ordinary person would not do, measured by all the circumstances then existing." See also PIK Civ. 2d 3.01 (1977). The court also instructed the jury with regard to causation, stating: "A party is at fault when he is negligent and his negligence caused or contributed to the event which brought about the injury or damages for which claim is made." This court's task, then, is to determine if there is evidence Linda Allman's actions exhibited a lack of ordinary care and, if so, whether that lack of ordinary care contributed to her death.

The first act of alleged negligence on the part of Ms. Allman was her voluntarily taking Ovulen-21 birth control pills despite the warning on the package.

Linda Allman took the birth control pills pursuant to a doctor's prescription. This fact, along with the widespread disregard of warning labels on packages, prohibits a finding of fault on the part of Ms. Allman. Even though there is a recognizable risk, conduct, to be negligent, must be unreasonable. Prosser, Law of Torts § 31 (4th ed. 1971). As we are becoming constantly more aware, nearly all human acts carry with them some degree of risk. When that risk is slight enough that it is commonly disregarded, however, the standard of ordinary care is not violated. Such is the case here with the taking of birth control pills. For an analogous situation, see *Sawka v. Prokopowycz,* 104 Mich. App. 829, 306 N.W.2d 354 (1981), where the court held it was error to submit

the issue of the plaintiff's contributory negligence for smoking cigarettes in an action based on the failure to diagnose lung cancer.

The concept of fault also requires a causal connection between the conduct in question and the injury complained of. A negligent act is the proximate cause of an injury only when the injury is the natural and probable consequence of the wrongful act. *Wilcheck v. Doonan Truck & Equipment, Inc.*, 220 Kan. 230, 552 P.2d 938 (1976). Here any connection between Ms. Allman's death and her taking Ovulen-21 is speculative and remote. Her death was caused by the dislodging of the endotracheal tube.

As indicated above, this action was brought in part to recover for the conscious pain and suffering of Linda Allman which occurred before her death. The symptoms Linda sought medical treatment for had some similarity to the warnings listed on the birth control pills. Thus, the taking of the pills could possibly be relevant to pain and suffering. The trial court, however, made no distinction between wrongful death and pain and suffering in its instructions. As such, the jury instructions were misleading and confusing.

The second assertion of negligence on the part of Linda Allman was her alleged failure to give an accurate medical history. The evidence in the case indicated it was very unusual for a ruptured spleen to occur without some prior trauma to the area. Ms. Allman never indicated any trauma when she related her medical history. Thus, the appellees contend the jury could easily infer she gave an inaccurate history. They provided, however, no evidence that she did in fact give an inaccurate history. Further, as the warnings on the birth control pill package indicated, abnormal blood clotting was a risk which might lead to an injury such as a ruptured spleen. The giving of an inaccurate medical history could be a negligent act, but here there is no evidence of such an act.

With regard to causation on this issue there was again no distinction in the instructions between the wrongful death action and the claim for conscious pain and suffering. The failure to give an accurate medical history would have been more closely connected to Linda Allman's conscious pain and suffering than to her actual death.

The court's failure to differentiate between the claims made on

behalf of Linda Allman's children and those made by her estate also creates a problem with regard to the next act of alleged negligence, Linda Allman's delay in seeking medical treatment. Indeed, there was evidence Ms. Allman had been experiencing rather severe symptoms for two weeks prior to July 7, 1975. There was also evidence she was a week late in keeping her appointment with Dr. Holleman for her monthly checkup. Although the delays could have contributed to her conscious pain and suffering, it certainly had nothing to do with the immediate cause of her death—the removal of the endotracheal tube.

The final area in which Linda Allman was allegedly negligent was the part she played in causing her endotracheal tube to become dislodged. The evidence indicated Linda Allman was restless prior to the time of her death and had to be placed in restraints for the purpose of preventing the tube from dislodging. Indeed, she had already extubed herself once. The question here, however, concerns whether her actions amounted to negligence. According to the trial court's instructions Linda Allman could be considered negligent if she failed to do what an ordinary person would do under the same circumstances. The evidence indicated it is normal for an endotracheal tube to become dislodged when a patient is restless or sweaty. In this respect Linda Allman did nothing out of the ordinary. She was in intensive care because she needed more than ordinary assistance. Under such circumstances it would take strong evidence Ms. Allman was consciously responsible for the removal of the tube. Defendants introduced no such evidence. We hold one in intensive care is not negligent in inadvertently removing life support equipment. We find no evidence of negligence on the part of Ms. Allman.

Appellants also argue the trial court erred in allowing evidence of the resources available to Linda Allman's children as a result of the death of their father, James Allman. Mr. Allman had been killed in an occupational accident approximately one year earlier.

Prior to trial appellants moved the trial court to exclude all evidence regarding benefits received by the Allman children. The trial court overruled this motion except that it excluded evidence of "any insurance policy benefits received by plaintiffs as a result of the death or treatment of Linda Allman." During the

direct examination of Milton Watters appellants' counsel inquired as to why Mr. Watters had not attempted to adopt the Allman children. Mr. Watters replied that adoption "would interfere with their social security rights." During cross-examination of Mr. Watters opposing counsel was permitted to elicit information from him of the total amount of social security received and the amount of a trust fund available to the children from their father's estate.

Except as otherwise required by statute or constitution, all relevant evidence is admissible. See K.S.A. 60-407(f). Thus, the court first must decide whether the evidence regarding benefits received by the Allman children was relevant.

The action brought on behalf of Shane and Amy was for the wrongful death of their mother. A wrongful death action may be brought by any of the deceased's heirs at law to obtain damages resulting from the death. K.S.A. 60-1901 and 60-1902. Except for pecuniary loss, damages in a wrongful death action cannot exceed $25,000. K.S.A. 60-1903. Thus, any large recovery by a plaintiff in a wrongful death action will consist mainly of pecuniary damages. According to Black's Law Dictionary 1343 (3rd ed. 1933), pecuniary loss in a wrongful death action refers to:

"the reasonable expectation of pecuniary benefit from the continued life of the deceased, to be inferred from proof of assistance by way of money, services, or other material benefits rendered prior to death. [Citations omitted.] 'Pecuniary loss' is a term employed judicially to discriminate between a material loss which is susceptible of pecuniary valuation, and that inestimable loss of the society and companionship of the deceased relative upon which, in the nature of things, it is not possible to set a pecuniary valuation."

The evidence of benefits received from Mr. Allman's estate was admitted on the theory it would tend to reduce the amount of money Ms. Allman would have provided for the support of her children.

Appellants argue the evidence was irrelevant and should have been excluded under the "collateral source" rule. This rule provides "benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer." *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, 446, 647 P.2d 320 (1982). See also *Selgado v. Commercial Warehouse Company*, 86 N.M. 633, 526 P.2d 430 (1974); *Cagle v. Atchley*, 127 Ga. App. 668, 194 S.E.2d 598 (1972).

We agree. As the definition illustrates the collateral source rule is merely a species of the relevancy doctrine. Here the question for the jury was the value of Ms. Allman's lost services and monetary contributions to the children. The fact the children received some assistance from another source has nothing to do with the services and support provided by Ms. Allman herself. We hold it was error for the trial court to admit evidence of resources available to the children from other sources.

The judgment of the trial court is reversed and this case remanded for a new trial.

SCHROEDER, C.J., dissenting: A review of the record on appeal discloses that sufficient evidence was presented at trial to properly submit the issue of Linda Allman's alleged negligence, as set forth in Instruction No. 13, to the jury for comparison with the alleged fault of the defendants. The plaintiffs alleged Dr. Holleman and Dr. Mesina were negligent in failing to timely diagnose Ms. Allman's condition and perform the necessary surgery, and Dr. Cotter was negligent in the manner in which he had reinserted the endotracheal tube after Ms. Allman had dislodged it. The majority opinion holds that submitting the issue of Linda Allman's fault to the jury was error because there was *no evidence of a causal connection* between Ms. Allman's death and taking Ovulen-21, her failure to give an accurate medical history or her failure to seek prompt medical attention; that it is not negligence for an intensive care patient to "inadvertently" remove life support equipment; and because the trial court made no distinction in the instruction between the wrongful death action and the claim for conscious pain and suffering.

The evidence is clear that Linda Allman was aware of the possible side effects from taking Ovulen-21. The symptoms which could result from taking the pill and which the package insert warned against included nausea, vomiting, abdominal cramps and bloating, change in weight, rise in blood pressure, depression, headache and nervousness. Linda Allman experienced *all* of these symptoms for at least two weeks prior to being hospitalized, and yet continued to take the pills. The package insert also expressly warned that "the most serious known side effect is abnormal blood clotting." The defendants' expert witness testified that in his opinion the blood clotting which led to

the ruptured spleen was caused by the taking of Ovulen-21. The plaintiffs' expert witness testified the preliminary leaking from the spleen could have occurred several days to a couple of weeks prior to when Ms. Allman entered the hospital. He further testified that the delay in the diagnosis of the ruptured spleen allowed internal bleeding from the spleen to continue, the effect of which caused or contributed to the pulmonary problems developed by Ms. Allman following surgery. These pulmonary complications, which necessitated the endotracheal tube, eventually led to Ms. Allman's death.

The undisputed evidence at trial established that Linda Allman had experienced severe chest pains and other symptoms for at least two weeks before seeing Dr. Holleman. She experienced additional pain and tenderness in her abdomen for four days prior to her visit to him. The plaintiffs' own evidence established the critical relationship between the delay in the diagnosis of the ruptured spleen and the development of the pulmonary problems suffered by Ms. Allman. Whether or not Linda Allman departed from the standard of ordinary care by continuing to take Ovulen-21 after her symptoms arose or by delaying to seek medical attention for the chest pains and other symptoms was a question to be resolved by the jury. Sufficient evidence was presented of a causal connection between these acts and the condition ultimately causing Ms. Allman's death from which the jury was entitled to conclude that had Linda Allman ceased to take the pills and sought medical treatment when she began experiencing symptoms of side effects two weeks earlier, her condition may not have deteriorated to the state to which it did and an earlier diagnosis may have resulted. Had it not been for the ruptured spleen, allegedly caused by the birth control pills, and the delay in diagnosis of the condition, the pulmonary edema necessitating the endotracheal tube would not have developed and Ms. Allman would not have died. To say there is no evidence of a causal connection between the immediate cause of death, the removal of the endotracheal tube, and the continued use of the pills and delay in seeking medical attention, ignores the testimony presented at trial establishing that each event was inextricably linked to the other and that the condition necessitating the tubes would not have developed in the absence of the ruptured spleen and delay in diagnosis. See Annot., Foreseeabi-

lity as an Element of Negligence and Proximate Cause, 100 A.L.R.2d 942; Annot., Proximate Cause in Malpractice Cases, 13 A.L.R.2d 11; PIK Civ. 2d 5.01 *et seq.*

The evidence presented at trial was also sufficient to submit to the jury the issue of Linda Allman's fault in failing to give a complete and accurate medical history. The medical evidence established that a ruptured spleen is almost always the result of trauma. The defendants' expert testified that a trauma precedes a ruptured spleen in 99% of the cases. Without a history of trauma, a physician would rule out a ruptured spleen. Linda Allman did not give a history of trauma to either Dr. Holleman or Dr. Mesina. This failure on the part of Linda Allman is evidence the jury was entitled to consider in light of the expert testimony.

A jury is entitled to draw all reasonable inferences of fact from the evidence. See, *e.g., State v. Hutton,* 232 Kan. 545, Syl. ¶ 4, 657 P.2d 567 (1983). Despite the lack of evidence that Linda Allman had, in fact, suffered a trauma which she failed to report, based upon the evidence presented the jury could have determined that the rupture of the spleen was caused by the Ovulen-21 or by a trauma which Ms. Allman failed to report to her physicians. In either case, the evidence was sufficient to support a finding of comparative fault on the part of Linda Allman, and therefore was properly submitted to the jury.

The evidence was also sufficient to submit to the jury the issue of Linda Allman's fault in dislodging the endotracheal tube, which was the immediate cause of death. There was testimony from attending nurses that the afternoon of her death Ms. Allman was struggling and pulling away from the tube, and was very restless. She was ultimately placed in restraints to prevent her from extubating herself. A nurse testified Ms. Allman was alert as late as 6:40 p.m. on the day of her death. Ms. Allman's mother testified that when she visited her daughter between 6:55 and 7:05 p.m., shortly before the tube was dislodged for the second time, her daughter was conscious, the tube was in place, and the taping on the tube was secure.

The evidence was sufficient to submit this issue to the jury. The fact that evidence was presented which explained how the tube could have become dislodged without the fault of Linda Allman does not preclude the jury from considering the evidence which would attribute the cause of the event to her. The plain-

tiffs offered no evidence that Linda Allman's mental state was in any way diminished or that she did not know what she was doing. It was for the jury to decide whether Linda Allman failed to exercise ordinary care under the circumstances.

. The decision in this case requires the trial court to analyze the evidence and determine whether, in the court's opinion, it substantially supports *every claim of negligence asserted in the case* before submitting the case to the jury with instructions. This places an impossible burden on the trial court and is contrary to established principles of law. In a comparative negligence case where many parties make numerous allegations of negligence against the various antagonists the trial of the case will be a nightmare for all concerned. It is the function of the jury to review and weigh all the evidence in the case and to determine whether or not the alleged conduct of the various parties amounts to negligence. Where a jury verdict is attacked for insufficiency of the evidence the duty of the appellate court extends only to a search of the record for the purpose of determining whether there is any competent substantial evidence to support the findings. The appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below. *Cantrell v. R. D. Werner Co.,* 226 Kan. 681, 684, 602 P.2d 1326 (1979). Furthermore, an instruction is properly given where there is any evidence in the record to support it. The evidence need not be direct, or conclusive or even convincing to support the submission. *Moseman v. Penwell Undertaking Co.,* 151 Kan. 610, 100 P.2d 669 (1940); *McKnight v. Building Co.,* 96 Kan. 118, 150 Pac. 542 (1915).

Contrary to these principles the majority opinion disregards evidence presented which, when viewed in the light most favorable to the defendants, supports the jury's verdict. In doing so the majority relies in part on the rationale that the trial court erred in failing to differentiate in giving the comparative negligence instructions between the wrongful death action and the claim for conscious pain and suffering, as there was no causal connection between Linda Allman's death and the taking of Ovulen-21, the delay in seeking medical attention or the failure to give an accurate medical history. As discussed above, how-

ever, evidence was presented establishing a causal connection between these events and Ms. Allman's death. Notwithstanding this, under K.S.A. 60-251(*b*), where no objection is made to an instruction before the jury retires to consider its verdict it becomes the law of the case unless clearly erroneous. See *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, Syl. ¶ 7, 657 P.2d 517 (1983); *Sieben v. Sieben*, 231 Kan. 372, Syl. ¶ 5, 646 P.2d 1036 (1982). Counsel for the plaintiff objected to the instruction only upon the ground that there was no evidence to support the allegations of negligence on the part of Linda Allman. No objection was made to the form of the instruction, or that some of the claims of comparative negligence were relevant only to the claim for pain and suffering while others were relevant to the wrongful death action. This was the choice of counsel for the plaintiff and is a trial tactic employed by counsel which binds the plaintiff. The trial court is under no duty to give instructions on every possible theory of liability which are not requested by counsel. Aside from the claim of insufficient evidence there is no suggestion by any of the parties that the instruction was clearly erroneous. An instruction is clearly erroneous only when the reviewing court reaches the firm conviction that if the error had not occurred the jury would have returned a different verdict. *Musil v. Hendrich*, 6 Kan. App. 2d 196, Syl. ¶ 3, 627 P.2d 367 (1981). There is nothing in the record to suggest that had a distinction been made between the claims asserted by the plaintiffs in giving the instructions on Linda Allman's comparative negligence the jury would have returned a different verdict.

The evidence of the financial resources available to the minor plaintiffs as a result of the previous death of their father was properly admitted by the trial court for several reasons. These resources were not generated by Linda Allman's death, but were available to the minor plaintiffs independent of Linda Allman and were highly relevant to the issue of monetary loss sustained by the children as a result of the death of their mother. As discussed in the majority opinion, the plaintiffs in a wrongful death action are entitled to recover for the loss of "the reasonable expectation of pecuniary benefit from the continued life of the deceased, *to be inferred from proof of assistance by way of money, services or other material benefits rendered prior to death.*" Linda Allman had not been employed for several years

prior to her death. The losses for which the children were to recover were not losses of financial support, but the value of services Linda Allman provided for her children. The evidence was clearly relevant to establish that the financial resources available for the children following their mother's death were the same as they would have been had she lived.

The record reflects that throughout the course of the trial plaintiffs' counsel commented on the children's prior loss of the father. These comments undoubtedly were intended to create sympathy for the children in the minds of the jurors, as the fact of Mr. Allman's prior death was hardly relevant to the plaintiffs' present cause of action. The evidence of the minor plaintiffs' financial support notwithstanding the death of Linda Allman insured that the jury verdict compensated the plaintiffs for the loss of only one parent, their mother, and not the previous loss of their father.

Furthermore, the comment elicited from Mr. Watters on direct examination by counsel for the plaintiff, that he had not attempted to adopt the Allman children because "it would interfere with their social security rights," was in direct response to the question asked and was clearly designed to prejudice the jury in favor of the children by inferentially suggesting the children were in a state of poverty. To rebut this false impression in the minds of the jurors counsel for the defense was entitled to make further inquiry on cross-examination into the area of financial support. Mr. Watters' comment created an unfair inference that the social security benefits were so essential for the support of the children that it had precluded the Watters from adopting their grandchildren. The defendants were entitled to cross-examine Mr. Watters concerning financial resources available for the children to correct the misimpression that the social security benefits were the sole means of support. To ensure that the evidence of financial support was properly considered by the jury for the purpose for which it was offered the trial court instructed:

"You are not to consider the fact that these minor plaintiffs are the beneficiaries of their father's estate nor the amount of any monies that may be in said estate. Any verdict that you render for the plaintiffs should not be reduced by virtue of the fact that these minor plaintiffs may receive benefits from their father's estate." (Instruction No. 17.)

The plaintiffs were not prejudiced by the admission of this evidence and the jury was properly instructed.

Accordingly, it is respectfully submitted the judgment of the learned trial judge should be affirmed.