**UNION PACIFIC RAILROAD COMPANY, Plaintiff,**

v.

**GENERAL FOODS CORPORATION, Defendant.**

No. 82–4304.

United States District Court, D. Kansas.

Feb. 20, 1987.

Eidson, Lewis, Porter & Haynes, Thomas Haney, Topeka, Kan., for plaintiff.

Steve Fabert, Fisher, Patterson, Sayler & Smith, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a diversity action. Plaintiff, Union Pacific Railroad Company, seeks contribution from the defendant, General Foods Corporation, for monies paid by Union Pacific in the settlement of a wrongful death lawsuit brought against them. Union Pacific contends that it is entitled to contribution based on the provisions of a contract entered into with General Foods. This matter is presently before the court upon General Foods' motion for summary judgment.

The factual background of this action was set forth in our order of March 17, 1986, as follows:

On October 21, 1969, Union Pacific and General Foods entered into an industry track contract on a form provided by Union Pacific. Pursuant to the industry track contract, Union Pacific generally furnishes railroad service to General Foods' plant in Topeka, Kansas. Paragraph two of section nine of the industry track contract provides:

The Industry also agrees to indemnify and hold harmless the Railroad Company for loss, damage or injury from any act or omission of Industry, its employees or agents, to the personal property of the parties hereto and their employees and agents, and to the person or property of any other person or corporation, while on or about the

Track; and if any claim or liability other than from fire shall arise from the joint or concurring negligence of the parties hereto (or of any two or more of them if there are more than two), it shall be borne equally by the parties at fault.

On April 29, (sic) 1979, an employee of General Foods, Dale Eugene Karns, was killed when an outside door from a boxcar belonging to Union Pacific fell on the decedent during the course of his employment at the General Foods plant. Following the accident, General Foods made certain payments to the family of the decedent pursuant to the Kansas Workmen's Compensation Act. On September 21, 1979, the heirs of Karns commenced litigation in this court for damages arising out of the death of Karns. Union Pacific was named a defendant in that case, along with the manufacturers of the boxcar and the door. General Foods was immune from liability under the Workmen's Compensation Act and was not a named defendant in that case. Union Pacific informed General Foods of the status of settlement negotiations between the parties in the case and made a formal demand upon General Foods to indemnify Union Pacific in accordance with the terms of the industry track contract. General Foods refused to provide indemnification, denying liability to Union Pacific under the industry track contract. Eventually, a settlement agreement was entered into between the manufacturers of the door and the boxcar and the heirs of Karns and approved by the court. Thereafter, a settlement agreement was entered into between Union Pacific and the heirs of Karns. This agreement was also approved by the court. Following the settlement, General Foods asserted its rights to subrogate out of the settlement proceeds the amount which it had paid under the Workmen's Compensation Act to decedent's heirs. Under its settlement agreement with the decedent's heirs, Union Pacific was required to and did reimburse the heirs in the amount of such subrogation interest, which amount was repaid by the heirs to General Foods.

In the order of March 17, the court interpreted the aforementioned provision of the industry track contract. The court concluded that General Foods would be liable in this action if both Union Pacific and General Foods were concurrently negligent in causing the accident on April 19, 1979. Union Pacific contends that General Foods' employees acted negligently or were negligently trained or supervised in using a forklift truck to open the door on the boxcar. In the instant motion, General Foods contends that it is entitled to summary judgment because the discovery record reveals no evidence of any negligence by General Foods' employees in using a forklift to start the movement of the boxcar door or causing the door to fall and kill Karns.

■ In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the opposing party. *Barber v. General Electric Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir.1981). The standard for granting summary judgment is the same as the standard for granting a directed verdict under Fed. R.Civ.P. 50(a). *Celotex Corp. v. Catrett*, — U.S. ——, ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The mere existence of a scintilla of evidence in support of plaintiff's position will not be sufficient; there must be evidence on which a jury could reasonably find for the opposing party. *Anderson v. Liberty Lobby, Inc.*, — U.S. ——, ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Many of the pertinent facts to the instant motion are undisputed. The court shall set forth these facts and then discuss any other facts which remain disputed. On April 19, 1979, Dale Karns was employed by General Foods at its facility at 2400 Brickyard Road in Topeka, Kansas. Karns had worked for General Foods for two and one half years. He had been working on the warehouse crew for approximately six weeks. On April 19, 1979, Karns was working with Calvin Porter. Porter was a

more experienced employee. He had worked for General Foods for nine years. On that day, Karns and Porter were assigned to load boxcars. They began by opening the doors on the boxcars. Karns approached Union Pacific boxcar number 490972. He turned the door's opening lever and attempted to open the plug type door. The door popped towards Karns but would not slide along the tracks which guide the door alongside the boxcar. Porter saw that Karns was not succeeding in opening the door by hand. He tried to help Karns push the door, but they were unsuccessful. Porter assumed that the door would not roll due to rust. Porter had visually inspected the door prior to their efforts to open it and had not noticed any defects or other problems. Porter decided to use a forklift to start the door moving. He raised the forks to halfway of the height of the door and gave the door a little push. The door started to move. The door then rolled by itself or was gently pushed by the forklift to one-third open. Karns then pushed the door by himself to a position within one foot of being fully opened. Porter dismounted the forklift truck and entered the boxcar to inspect the interior after observing the door come to a complete stop as Karns pushed it open. From inside the boxcar, Porter heard Karns operating the door opening lever. He thought Karns was trying to get the door completely open. He next heard a loud noise. He rushed out of the boxcar and saw that the door of the boxcar had fallen off. He discovered that Karns was underneath the door. Karns eventually died as a result of the door falling on him.

This accident was investigated, reviewed and analyzed by a number of individuals. The court has carefully considered the entire discovery record provided by the parties. The court has read every deposition, report and statement given by the various lay witnesses and expert witnesses. Further, the court has carefully viewed every photograph, drawing and diagram generated by the investigations of this accident. In sum, the court has thorough knowledge of the information that has been obtained during discovery.

General Foods contends that all of the expert witnesses who have studied this accident have concluded that the boxcar door fell because of a faulty weld in the hood which retains the door at the top. They contend that the discovery record fails to provide credible evidence that the use of the forklift was negligent or that its use caused the accident. Union Pacific contends that the discovery record does indeed show that use of the forklift was negligent. They further argue that the discovery record supports a finding that the use of the forklift was the proximate cause of the accident based on three alternative theories. First, they suggest that the discovery record supports their allegation that the forklift caused the deformation which contributed to the accident. Second, they assert that the discovery record supports their theory that if the forklift had not been used to open the boxcar door, then the accident would not have occurred. Third, Union Pacific asserts that the failure of General Foods to establish and enforce reasonable safety procedures was the proximate cause of the accident.

 The court shall first consider whether summary judgment should be granted to General Foods because, as a matter of law, the use of the forklift did not constitute negligence. Negligence, of course, is the lack of due care and encompasses an act of commission or omission, wrongful in itself. *Owings v. Gifford*, 237 Kan. 89, 697 P.2d 865, 869 (1985). The question of negligence is ordinarily an issue for the jury. *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585, 598 (1982). Union Pacific points to three facts in the discovery record to support its contention that the use of the forklift constituted negligence. First, the employees of General Foods had been warned not to use forklifts to open or close the doors of boxcars. Second, a poster inside the boxcar involved in this case stated: "Don't use fork lifts to open doors or move bulkheads." Third, an OSHA regulation, 29

C.F.R. § 1910.178(m)(6), prohibited the use of forklifts to open and close boxcar doors.

General Foods has responded that the discovery record shows that, despite the aforementioned warnings, forklifts were commonly used to open the doors of boxcars. General Foods' position is that this common usage, coupled with some other evidence in the discovery record, renders its conduct not negligent as a matter of law. This additional evidence consists of the reports of the General Foods' safety coordinator and an OSHA investigator. Both of these individuals investigated the accident and found no violation of any plant safety rules or OSHA rules by General Foods. General Foods suggests that, based on actual practice, they were not negligent as a matter of law. They rely upon the following statements from *Allman v. Holleman*, 233 Kan. 781, 667 P.2d 296, 300 (1983) for support:

> Even though there is a recognizable risk, conduct, to be negligent, must be unreasonable. Prosser, Law of Torts § 31 (4th ed. 1971). As we are becoming constantly more aware, nearly all human acts carry with them some degree of risk. When that risk is slight enough that it is commonly disregarded, however, the standard of ordinary care is not violated.

■ The court has carefully considered the arguments of the parties and, although the issue may be a close one, we do not believe that General Foods is entitled to summary judgment on this issue. The question of whether the use of a forklift to open the door of a boxcar constitutes negligence is one for a jury.

■ The court shall now consider the second argument presented by General Foods in this motion. This is the question of whether the use of the forklift or any other alleged negligence of General Foods was the proximate cause of the accident on April 19, 1979. Proximate cause is a prerequisite for a finding of liability due to negligence under Kansas law. *Allman v. Holleman*, 233 Kan. 781, 667 P.2d 296, 300 (1983). Proximate cause is defined as that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. *Wilcheck v. Doonan Truck & Equipment, Inc.*, 220 Kan. 230, 552 P.2d 938, 942–43 (1976). Ordinarily, the issue of proximate cause is a question of fact for the jury. *Stucky v. Johnson*, 213 Kan. 738, 518 P.2d 937, 938 (1974). The issue, however, becomes a question of law when all the evidence upon which a party relies is undisputed and susceptible of only one inference. *Schenck v. Thompson*, 201 Kan. 608, 443 P.2d 298, 306 (1968).

The testimony of the expert witnesses is generally unanimous that the cause of the accident was a mechanical defect in the boxcar door, particularly in the top retaining wall or hood. Each of these witnesses has offered an explanation for how the defect or defects occurred. None of the witnesses, except one, concluded that the forklift in any way caused the accident. The lone exception was Kenneth Razak, the plaintiff's expert witness. A complete review of his testimony is necessary to determine if the Union Pacific's allegations are sufficiently supported to allow them to avoid summary judgment.

The Union Pacific first argues that the testimony of Mr. Razak supports their allegation that the forklift caused the deformation which contributed to the accident. The exact nature of this allegation is not clear. The court is not sure whether plaintiff contends that the use of the forklift by Calvin Porter on April 19, 1979 caused the deformation or that the repeated use of forklifts on the door of boxcar number 490972 by employees of General Foods caused the deformation. The court shall examine both possibilities to determine if there is evidence to support either contention.

Mr. Razak was contacted by the Union Pacific in November, 1979 to investigate the accident of April 19, 1979. He examined photographs of the boxcar and the door and read the statements and reports taken after the accident. He further exam-

ined the top retainer and the bottom rollers that had been removed from the boxcar. He, however, never saw or examined the boxcar, the door, or the forklift. After he finished his examination, he sent counsel for Union Pacific a letter stating his findings and conclusions. The letter concludes as follows:

In my opinion three factors contributed to this accident. They are as follows:

1. Improper design of the upper retainer leg which produced severe deformation and slipping of the upper retainer roller from the retainer guide at some previous time.

I infer that the material used in this guide was a low carbon steel of approximately 50,000 pounds ultimate tensile strength. This steel would have a yield strength between 35,000 and 40,000 pounds per square inch. It cannot be heat treated, which is verified by the fact that a test flap was cut and bent outward to measure deformation forces. This flap was then heated and returned to its original position following which another deformation force test was conducted. The results of the second force test were similar to the first force test, indicating that the steel was neither heat treated nor softened as a result of this heating. This implies a non-heat treatable steel which is consistent with this structural strength.

Either a higher strength steel or a thicker metal should have been used in this retainer.

2. Improper welding of a repair to the upper retainer guide which produced a weak point in the guide such that the upper retainer rollers could escape by bending this flap outward.

3. Improper procedure in opening the door, namely using the fork lift truck. It would not be possible to absolutely guarantee that only forces parallel to the plane of the door would be produced by a forklift and it is inevitable that some outward forces would be applied. This outward force had to exist many times in order to deform the retainer guide to its shape as shown in my photographs.

It would be necessary for me to see either this particular car or an identical car before I could make any calculations to judge the magnitude of forces that were involved. If you judged that this would be appropriate please advise.

■ The court is concerned only with the last of his conclusions. This conclusion must be examined in light of his deposition testimony. This testimony further explains the final conclusion of his letter. In his deposition, Mr. Razak was unable to state that the employees of General Foods had caused the deformation of the upper retaining hood by use of the forklift on past occasions or on the day of the accident. Mr. Razak was able to testify only that a forklift *could exert force in the direction* necessary to cause a bend in the upper retaining hood. He, however, was unable to state whether a forklift *could exert enough force in that direction* to cause a bend. He frankly admitted that he had not done the necessary additional calculations and study to make this determination. Without expert testimony on this point, Union Pacific has not shown evidence on which a jury could reasonably find that the use of the forklift proximately caused the death of Dale Karns. Thus, the testimony of Mr. Razak fails to support the allegation made by the Union Pacific that any negligence by employees of General Foods was the proximate cause of the accident involving Dale Karns.

Union Pacific next argues that "the use of the forklift was the proximate cause of the accident because it set in motion the series of events which foreseeably resulted in the injury to Mr. Karns." This argument is based on the contention that the boxcar should have been "bad ordered" when the door would not open. The court believes that this argument must fail for two reasons. First, the facts in the discovery record do not support this contention. Second, the contention is based on a misunderstanding of the concept of "proximate cause."

■ The particular facts pertinent to this allegation show that employees of General Foods did "bad order" boxcars that were inoperable or unsafe. When a boxcar is bad ordered by an employee of General Foods, it is rejected for use and sent to the Union Pacific for repairs or maintenance. In this case, Calvin Porter, an experienced General Foods employee, visually inspected the boxcar and saw no defects or problems. Porter and Karns did find that the door of the boxcar was difficult to open. This problem, however, was not unusual. In 1979, approximately 50 to 60 percent of the boxcars provided for use at the General Foods facility had rusty doors which could not be opened manually. The employees of General Foods had been told to use chains, crowbars and wrenches to open doors that were rusty. Porter believed that the door on boxcar number 490972 was rusty. He did not use a chain, crowbar or wrench to attempt to open the door because they were not handy. Instead, he used a forklift. These facts do not suggest that the boxcar should have been bad ordered. They suggest just the opposite. The doors of boxcars supplied to General Foods were routinely difficult to open. Porter and Karns handled the opening of this boxcar door in the same manner as others were handled. There is no evidence before the court to suggest that the use of some other device such as a chain, crowbar or wrench would not have opened this door. We find nothing in the evidence before the court to support the Union Pacific's allegation that the use of the forklift *caused* the accident in question.

■ Moreover, we believe that the Union Pacific's contention is a misinterpretation of the law of causation. It is obvious that if the door of the boxcar had never been opened, then Mr. Karns would not have been fatally injured. However, the fact that something may have set in motion a chain of events that led to an individual's injury does not necessarily suggest proximate cause for that injury. As previously stated, proximate cause is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. Under the facts of this case as previously discussed, the injury to Mr. Karns did not result from the use of the forklift, but rather from the defects in the upper retaining rail. The use of the forklift was purely fortuitous, and produced no results that would not have been produced by the use of a chain, crowbar or wrench. There is no evidence in the discovery record to suggest that the use of the forklift was required. The use of the forklift created no condition or chain of events that would not also have resulted from the use of any other tool.

A review of the several recent Kansas cases helps explain the concept of proximate cause and demonstrates the error of the Union Pacific's argument. In *Allman v. Holleman, supra,* Linda Allman had complained to her doctor about various problems. At the time of her complaints, she was taking birth control pills. These pills had been prescribed by another doctor. The pills carried a warning label as to some of the symptoms of which she was making complaints. Ms. Allman was ultimately hospitalized after developing pain and tenderness in the stomach area. She underwent surgery and her ruptured spleen was removed. After surgery, she developed pulmonary edema, a condition in which the lung tissue retains too much fluid causing the patient to have respiratory problems. To assist Ms. Allman in breathing, an endotracheal tube was placed in her trachea and connected to a ventilator. The tube subsequently dislodged and she died. A lawsuit was brought on behalf of her minor children for the wrongful death of their mother. The executor of Ms. Allman's estate also brought an action for the conscious pain and suffering of Ms. Allman. The actions were brought against her doctors and the hospital in which she died. The cases were ultimately tried, and the jury found Ms. Allman to be 40% at fault. The plaintiffs appealed and contended, *inter alia,* that the court erred in allow-

ing the jury to consider whether Ms. Allman was at fault for taking the birth control pills in spite of the warning label on the package. The Kansas Supreme Court directly confronted the issue of whether the taking of the birth control pills was the proximate cause of Ms. Allman's death. The Court held that the taking of the pills was not the proximate cause of her death. The Court stated:

> Here any connection between Ms. Allman's death and her taking Ovulen–21 [the birth control pills] is speculative and remote. Her death was caused by the dislodging of the endotracheal tube.

667 P.2d at 301.

In *Fogarty v. Campbell 66 Express, Inc.*, 640 F.Supp. 953 (D.Kan.1986), the wife of a truck driver killed in a collision with another truck brought survival and wrongful death actions against the other truck driver and the owner and lessee of the other truck. The accident occurred at the intersection of two highways. Plaintiff alleged that the defendant truck driver failed to see and/or heed two "stop ahead" signs situated some distance from the intersection and the actual stop sign at the intersection. Plaintiff also alleged that the lessee of the truck, Campbell 66 Express, Inc., was negligent in failing to warn the truck driver that the particular intersection where the accident occurred was a dangerous one. Campbell 66 Express argued in a motion for partial summary judgment that its failure to warn the driver of the intersection's danger was not the proximate cause of the decedent's injuries. Chief Judge Earl E. O'Connor agreed. He stated:

> In the instant case, the parties agree that the route by which Budnik [defendant truck driver] approached the intersection where the collision occurred was well signed. According to the Highway Patrol diagram, there were two "stop ahead" signs located 1,409 and 746 feet before the stop sign, which, in turn, was located immediately before the intersection. That diagram also indicates that a driver passing along Budnik's route should have had a "clear view of [the] intersection" at a point located 1,185 feet before the stop sign. Campbell 66 had no reason to suspect that a professional truck driver such as Budnik would fail to see either the "stop ahead" signs or the intersection itself. Thus, the proximate cause of the collision was not Campbell 66's failure to warn Budnik of the intersection, but rather Budnik's failure to see and/or heed the "stop ahead" and stop signs. We therefore conclude that Campbell 66 is entitled to summary judgment on the issue of its independent liability for the death of plaintiff's decedent.

*Id.*, at 965.

The analysis applied in these cases is applicable to the facts of the instant case. Here, the use of the forklift did not in a natural and continuous sequence, unbroken by an efficient intervening cause, produce the injury to Mr. Karns. There was an efficient intervening cause—the defective weld—that caused the injury, much the same as occurred in *Allman* and *Fogarty*. If the Union Pacific's argument was correct, the courts in *Allman* and *Fogarty* would have been forced to conclude that the use of the birth control pills and the failure to warn of the dangerous intersection, respectively, were the proximate causes of the deaths in those cases. Of course, this is not the law. Accordingly, we are unable to conclude that the use of the forklift was the proximate cause of the death of Mr. Karns.

The final contention of the Union Pacific is that the failure of General Foods to establish and enforce reasonable safety procedures was the proximate cause of the accident. In its response to the instant motion, Union Pacific stated that "[t]he failure of Eugene Karns and Calvin Porter to follow the safety procedures outlined in the slide presentations caused foreseeable injury."

█ The court has several problems with this particular contention. The focus of the argument is apparently upon the failure of Karns and Porter to conduct a

thorough inspection prior to opening the door of the boxcar. There was some evidence in the discovery record that employees of General Foods did see a slide presentation on the opening and closing of boxcar doors. This presentation did present some instructions on the appropriate manner of inspecting boxcar doors prior to opening. The facts here, however, fail to suggest any negligence by either Karns or Porter that was the proximate cause of the accident. Porter, an experienced employee, testified that he visually inspected the boxcar door. He failed to note any problems. Thus, the evidence does not suggest any facts showing negligence or from which an inference of negligence can be derived.

The more fundamental problem with this contention is the Union Pacific's failure to assert this allegation in the pretrial order. The sole allegation of negligence by the Union Pacific contained in the pretrial order reads as follows: "Plaintiff alleges that defendant's employees acted negligently or were negligently trained or supervised in using a forklift truck to open a sliding door on a plug type boxcar supplied by plaintiff." The only negligence alleged relates solely to the use of the forklift. The court has already examined in great detail the Union Pacific's contentions concerning the forklift. Even if the evidence in the discovery record supported this contention, the court could not allow the Union Pacific to expand the allegations at this late date. The purpose of the pretrial order is to ensure the economical and efficient trial of every case on its merits without chance or surprise. *Smith v. Ford Motor Co.,* 626 F.2d 784, 795 (10th Cir. 1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981). A pretrial order may be modified to prevent manifest injustice. *Rock Island Improvement Co. v. Helmerich & Payne, Inc.,* 698 F.2d 1075, 1081 (10th Cir.1983), *cert. denied,* 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1302 (1983). Such a modification would be inappropriate under the circumstances of this case. The facts do not support a modification, and the lateness of such a request would not justify such a modification. In sum, this contention cannot be used to support the Union Pacific's contention that General Foods proximately caused the accident in question.

This is simply one of those rare cases where the court can and must grant summary judgment in a negligence action. The facts have been thoroughly discovered and they fail to reveal that the use of the forklift was a proximate cause of Mr. Karns' death. Accordingly, the court shall grant summary judgment to General Foods.

IT IS THEREFORE ORDERED that defendant General Foods Corporation's motion for summary judgment be hereby granted. Judgment shall be entered for the defendant and against the plaintiff.

IT IS SO ORDERED.