**CATTLE FINANCE COMPANY, et al., Plaintiffs,**

v.

**BOEDERY, INC., a/k/a Boerdery, Inc., Defendant.**

Civ. A. No. 92–2040–O.

United States District Court, D. Kansas.

May 20, 1992.

Joseph R. Colantuono, Polsinelli, White, Vardeman & Shalton, Overland Park, Kan., David Mullin, Steven L. Hoard, Joel R. Hogue, Mullin, Hoard & Brown, Amarillo, Tex., for Cattle Finance Co.

Richard D. Greene, Mark A. Ohlsen, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, Kan., for Marvin Ott.

F. Stannard Lentz, Lentz & Clark, Overland Park, Kan., Martha G. Hunt, Smith & Hunt, Little Rock, Ark., for David L. Branscum, Lawdon Branscum and Donald Branscum.

Joel K. Goldman, Husch & Eppenberger, Overland Park, Kan., for Boedery, Inc. aka Boerdery Inc.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This matter is before the court following a May 8, 1992, hearing on the motion of

plaintiff Cattle Finance Company for preliminary injunction. Joining in plaintiff's motion are intervenors Marvin Ott, David L. Branscum, Lawdon Branscum, and Donald Branscum. For convenience, the court will generally refer to Cattle Finance Company and the intervenors collectively as "plaintiffs."

*Background*

This dispute concerns the ownership of certain cattle located at a feedlot in St. Francis, Kansas. Plaintiff Cattle Finance Company ("CFC") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Friona, Texas. CFC is engaged in the business of advancing funds to borrowers for the purpose of acquiring cattle and paying for their care and feeding. Defendant Boerdery, Inc. ("Boerdery") is an Iowa corporation organized and existing under the laws of the state of Iowa with its principal place of business in that state. Boerdery's business is the buying and selling of cattle. Liberty Livestock Company ("Liberty") is a Kansas corporation that owned and operated certain feedyards located in St. Francis, Kansas, and Idalia, Colorado, until filing for bankruptcy protection on March 2, 1992.

In the summer of 1991, CFC advanced funds to David L. Branscum, Donald W. Branscum, Lawdon Branscum, James Daniel Geoghagen, Ronnie Harness, Ronnie Springer, and Marvin Ott ("CFC borrowers"). The purpose of the loans to the CFC borrowers was to enable them to purchase, refinance, and feed certain cattle to be located at the Liberty feedyards. CFC's borrowers executed demand promissory notes, security agreements, and letter agreements binding them to repay the funds advanced by CFC and granting to CFC a security interest in all cattle, including calves in gestation, located at the pens and feedyards owned and operated by Liberty Livestock Company. In accordance with these agreements, CFC advanced over $7,000,000 to the CFC borrowers.

Defendant Boerdery began shipping cattle to Liberty for feeding in late 1989. Liberty recorded information on each shipment in a register called the "Cattle–In Book." The incoming cattle were assigned a lot number (for identification) and a pen number (for location). Boerdery continued to ship cattle to Liberty through the end of 1991.

During this time, Ferrell McAtee, the feedlot manager at Liberty, was secretly engaging in a course of fraudulent conduct to deceive both Boerdery and the plaintiffs. Unbeknownst to any of the parties, McAtee created a second set of records to reflect different ownership of the cattle than reflected in the original Cattle In–Book. Although the exact scope of McAtee's deception is unclear, it is certain that he maintained multiple, inconsistent ownership records, and made numerous misrepresentations to the various parties concerning their ownership of the cattle at Liberty. In short, the plaintiffs claim they bought the disputed cattle from Liberty, while Boerdery maintains it owns the cattle since it has never received any proceeds for their sale. It appears that the plaintiffs advanced funds to McAtee to purchase the cattle, but McAtee diverted these funds to his own use rather than remitting them to Boerdery. In addition, the Branscums claim that they shipped their own cattle from Arkansas to Liberty for feeding, and that those are among the cattle in which Boerdery claims an ownership interest.

Pending before the court is CFC's motion for preliminary injunction. The parties previously entered into a consent preliminary injunction that allowed sale of the disputed cattle, and provided that the proceeds be escrowed pending the outcome of this litigation. Some of the cattle have been sold and the proceeds escrowed. Boerdery now opposes the injunction, claiming it needs the proceeds for operating expenses and will be forced out of business if the injunction remains in place. Plaintiffs fear that if the court does not issue an injunction, they will never be able to collect from Boerdery any judgment they might ultimately obtain. Thus, the issue presented is whether a preliminary injunction should issue to keep and maintain the proceeds from sale of the disputed

cattle in escrow pending the outcome of the litigation.

For the reasons stated below, the court concludes that a preliminary injunction should issue.

*Analysis*

The main purpose of a preliminary injunction is to preserve the status quo pending the outcome of the case. *Tri–State Generation v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986). In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful final decision on the merits. *Id.* To be entitled to a preliminary injunction, the moving party must demonstrate that: (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *Id.*

### 1. *Irreparable Injury*

■ Injury is generally not irreparable if compensatory relief would be adequate. *Id.* However, the Tenth Circuit has held that "[d]ifficulty in collecting a damage judgment may support a claim of irreparable injury." *Id.* Plaintiffs do not dispute that they could be made whole by an award of monetary damages, but fear that Boerdery's precarious financial condition will make it impossible for them to collect any potential judgment. Boerdery, on the other hand, contends that there is no reason to believe it could not pay a judgment if so ordered.

■ Boerdery's principal, Robert Wassenaar, testified that Boerdery is in financial trouble because of this dispute. Boerdery's line of credit is near its limit of one million dollars, and its operating funds are exhausted. At least two Boerdery lenders have security interests in the disputed cattle, and the loans are now in default. Was-

senaar testified that if the injunction were dissolved, Boerdery would pay the cattle proceeds to its creditors in an effort to remain in operation.

This situation is analogous to that in *Central States, Southeast & Southwest Areas Pension Fund v. Merchants Motor Freight, Inc.,* 511 F.Supp. 38 (D.Minn. 1980), *aff'd per curiam sub nom., Central States, Southeast & Southwest Areas Pension Fund v. Jack Cole–Dixie Highway Co.,* 642 F.2d 1122 (8th Cir.1981), relied upon by the Tenth Circuit Court of Appeals in *Tri–State. Tri–State,* 805 F.2d at 355. In *Central States,* the court found the plaintiffs had shown irreparable injury where the defendants' admittedly precarious financial condition increased the likelihood that they would be unable to satisfy any judgment ultimately rendered by the court. *Central States,* 511 F.Supp. at 42. Likewise in this case, serious doubt has been cast on Boerdery's ability to pay a money judgment of the magnitude that would likely be ordered if the plaintiffs were to prevail on the merits. If Boerdery is allowed to exercise its avowed intention to transfer the cattle proceeds to its creditors out of state, the court's ability to render a meaningful decision on the merits could be seriously impaired. The court must ensure that a plaintiffs' victory in this case would not be an empty one. *See Tri–State,* 805 F.2d at 356.

Accordingly, the court concludes that the evidence supports the plaintiffs' fears that Boerdery would be unable to pay a monetary judgment, and a finding of irreparable injury is therefore justified. *Tri–State,* 805 F.2d at 356; *Central States,* 511 F.Supp. at 42; *accord Teradyne, Inc. v. Mostek Corp.,* 797 F.2d 43, 53 (1st Cir.1986) (and cases cited therein), relying on, *inter alia, Deckert v. Independence Shares Corporation,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940); *see Deckert,* 311 U.S. at 290, 61 S.Ct. at 234 (injunction proper where "there were allegations that [defendant] was insolvent and its assets in danger of dissipation or depletion.").[1]

---

1. While the general rule is that a court may not     reach a defendant's assets unrelated to the un-

## 2. Balancing the Injuries

Plaintiffs must also show that the injury to them if the injunction does not issue outweighs the injury to Boerdery if the injunction does issue. *Tri–State*, 805 F.2d at 356.

Plaintiffs assert that, absent the injunction, Boerdery will dispose of the cattle proceeds to pay its creditors, placing those assets forever out of plaintiffs' reach. The harm in this is obvious—the plaintiffs might prevail on their claims, yet be driven into financial ruin. Boerdery counters that if the injunction remains in place, Boerdery will be forced into bankruptcy by its creditors. Thus it appears that, injunction or no injunction, harm to at least one of the parties cannot be avoided.

If the injunction does not issue, there is a fair chance that the cattle proceeds will be lost forever. But if the injunction remains in place, the money remains available for the prevailing party. If it is ultimately determined that Boerdery is entitled to the cattle proceeds, Boerdery will be awarded those proceeds. Likewise, the proceeds remain available to plaintiffs in the event they prevail on the merits. With the injunction, the rights of all parties are assured; in its absence, the rights of plaintiffs are put in jeopardy. Thus the balance of harm tips in favor of the plaintiffs.

The court is also mindful of its overriding goal: to preserve the status quo and the court's ability to render a meaningful decision on the merits. While the court is sympathetic to the financial woes of all the parties, visited upon them apparently through little or no fault of their own, the court is of the view that the only way to guarantee a meaningful decision on the

merits is by issuing the proposed injunction.

Accordingly, the court finds that the plaintiffs have shown that the balance of the injuries weighs in favor of issuing the proposed injunction.

## 3. Public Interest

The parties agree, and the court concurs, that the proposed injunction does not implicate the public interest in any significant way. Accordingly, the court finds that the plaintiff has shown that the injunction is not adverse to the public interest.

## 4. Probability of Success

The fourth prerequisite for obtaining a preliminary injunction is a showing of a likelihood of success on the merits. The Tenth Circuit has adopted a liberal definition of this requirement: "When the other three requirements for a preliminary injunction are satisfied, it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Tri–State*, 805 F.2d at 358 (quoting *Otero Sav. & Loan Ass'n v. Federal Res. Bank*, 665 F.2d 275, 278 (10th Cir.1981)). Plaintiffs have shown the other three factors are satisfied, and therefore this relaxed standard on the "probability of success" factor will apply.

This dispute arose because the fraudulent dealings of McAtee, the feedlot manager, caused both plaintiffs and Boerdery to believe they owned the same cattle. Plaintiffs claim they purchased the disputed cattle either from or through McAtee, and are therefore the rightful owners.

derlying litigation and freeze them as security for a potential money judgment, *In re Fredeman Litigation*, 843 F.2d 821, 824 (5th Cir.1988), the Supreme Court has distinguished an injunction of that type from one designed to (a) preserve property that might be the subject of a final decree or (b) enjoin conduct that might be enjoined under a final decree. *Id.* at 825, *quoting De Beers Consolidated Mines v. United States*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945). An injunction of either of these latter varieties is permissible because "[a] preliminary injunction

is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *Id.* The situation in this case, like that in *Tri–State*, where the disposition of the assets in dispute is the very harm against which the plaintiffs seek relief, is expressly envisioned in *De Beers*. *See In re Fredeman*, 843 F.2d at 827. Unlike the injunction found objectionable in *De Beers*, the injunction sought in this case concerns only the assets in dispute, and is therefore proper to protect the damages remedy. *See Id.; Tri–State*, 805 F.2d at 354–56.

Boerdery says it shipped the cattle to Liberty for feeding, and it never sold the cattle to anyone. What we now know is that McAtee was executing drafts against the plaintiffs' accounts for the purchase of cattle in Liberty's yards, but rather than paying the proceeds to Boerdery, McAtee diverted the money to other uses, a practice McAtee referred to in his deposition as "robbing Peter to pay Paul." All the while, McAtee was keeping two sets of records reflecting different ownership in the same cattle.

Plaintiffs' principal theory in support of their ownership claims is premised on U.C.C. § 2–403(2), codified in Kansas Statutes Annotated 84-2-403. This section sets out what is commonly known as the "entrustment doctrine":

> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business.

> (3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting of the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

K.S.A. 84-2-403 (1983 & Supp.1991). Plaintiffs contend that Boerdery entrusted its cattle to McAtee, a merchant who dealt in cattle, and that plaintiffs bought the cattle in good faith and in the ordinary course of business.

Plaintiffs' theory shows a fair ground for litigation.[2] Evidence adduced at the hearing showed that McAtee regularly sold cattle to interested buyers both in the name of Liberty and as a broker of sorts for Boerdery. Apparently, McAtee would solicit buyers for the cattle and then either broker the deal with Boerdery or purchase the cattle in the name of Liberty for retransfer to the purchasers. This happened on several occasions, and the practice was known to plaintiffs and Boerdery at the time. Therefore, there is evidence that Liberty was a merchant that dealt in the kind of goods now in dispute.

There is also evidence that supports plaintiff's contention that Boerdery entrusted its cattle to Liberty. As the statute makes clear, the conditions of the placement of goods with the merchant are irrelevant, and therefore it is not significant whether Boerdery intended for Liberty to sell the cattle.

The parties disagree whether the plaintiffs purchased the disputed cattle. The plaintiffs have produced some documentary evidence supporting their claims of purchase, and swear that the cattle remaining in Liberty's yards are consistent in weight with what should be expected from the cattle they bought. Marvin Ott has produced bills of sale to document his purchases, and the Branscums have produced some draft documents which they contend evidence the purchase of the disputed cattle. Boerdery challenges the proffered proof of ownership as inconclusive, and points out that no sales documentation of any kind exists for several of the disputed lots. Boerdery substantiates its ownership by documentary evidence such as in-records, feed bills, and yard sheets.

Whether plaintiffs purchased the disputed cattle is obviously one of the central issues in this dispute. However, it is not necessary for the court to determine at this point whether the plaintiffs actually purchased the cattle in dispute. It is sufficient at this point that the plaintiffs show there is a fair ground for litigation on this issue. The documentary evidence submitted by both sides is inherently unreliable due to the fraudulent activities of McAtee. What that leaves is a number of equally credible businessmen all asserting ownership in the same cattle, and relying on whatever documents that can be assembled to best sup-

---

**2.** The court does not intend to resolve the ultimate issues for trial at this stage of the proceedings. The discussion of the facts in this section of the opinion is merely to illustrate that plaintiffs have produced evidence in support of their claims, thereby demonstrating that there is a fair ground for litigation.

port their positions. In any event, there is sufficient evidence to show a fair ground for litigation on this issue.

Finally, Boerdery disputes plaintiffs' contention that they purchased cattle in the ordinary course of business. U.C.C. § 1–201(9) provides that a buyer in the ordinary course "means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind...." K.S.A. 84–1–201(9). Boerdery argues that because plaintiffs are merchants themselves, the good faith requirement is only satisfied if they acted with commercial reasonableness in addition to honesty in fact. While it may appear, in hindsight, that plaintiffs were less than vigilant in protecting their own interests, there was no evidence presented at the hearing against which the court can measure the reasonableness of their behavior. Boerdery's brief asserts many ways in which plaintiffs were careless, but there was simply no evidence regarding what is commercially reasonable in the cattle business. Therefore, the court is unable to determine whether plaintiffs acted in accordance with commercially reasonable standards. But in any event, the court need not decide this issue in finding a fair ground for litigation; likewise, the court need not decide whether the higher standard of good faith should apply to plaintiffs as merchants. The evidence shows that there is a fair ground for dispute on the issue of whether plaintiffs were buyers in the ordinary course, and that is all that is required at this point.

■ In light of the foregoing, the court finds that there is a fair ground for litigation on the plaintiffs' claims of ownership in the disputed cattle. Having so ruled, the court will only briefly discuss the plaintiffs' theory based upon common-law agency.

■ Advanced primarily by the Branscums, the gist of plaintiffs' agency theory is that based upon the parties' course of dealings, McAtee had actual or apparent authority to act as Boerdery's agent in selling cattle to the plaintiffs. Boerdery counters that McAtee was an agent for the plaintiffs, not Boerdery, and could not bind Boerdery when acting adversely to its interests. In Kansas, the party asserting an agency bears the burden of establishing its existence by clear and satisfactory evidence. *In re Branding Iron Motel, Inc.,* 798 F.2d 396, 401 (10th Cir.1986). "An agency does not exist merely 'because a third person assumed it existed, nor because the alleged agent assumed to act as such, nor because the conditions and circumstances were such as to make an agency seem rational and probable....'" *Id.* (quoting *Highland Lumber Co. v. Knudson,* 219 Kan. 366, 548 P.2d 719, 723 (1976)). The Kansas Supreme Court has defined an apparent agent as "one whom the principal has intentionally or by want of ordinary care induced third persons to believe to be his agent, although no authority has been conferred upon him, either expressly or by implication." *In re Branding Iron Motel,* 798 F.2d at 401 (quoting *Greep v. Bruns,* 160 Kan. 48, 159 P.2d 803, 808 (1945)).

From the evidence presented, the court would be hard pressed to find that the plaintiffs have shown a substantial likelihood of success on their agency claim. However, the court is not so hard pressed to find that there is a fair ground for litigation on this issue. Although the evidence was far from "clear and satisfactory," the plaintiffs have produced some evidence to support their apparent agency theory. The plaintiffs produced evidence that McAtee set up several successful cattle deals between plaintiffs and Boerdery before this dispute arose. In at least some instances, it appears McAtee would locate a buyer, collect the proceeds, and remit these funds to Boerdery. Boerdery was aware that McAtee was arranging these sales and, arguably, Boerdery either intentionally or by want of ordinary care induced the plaintiffs to believe that they were dealing with someone who had authority to act for Boerdery. Boerdery advances several arguments against plaintiffs' agency theory that might be persuasive were the court

**368**

reaching the merits; but the court does not reach the merits today, and therefore has no difficulty concluding that there is a fair ground for litigation on the agency issue.

In conclusion, the court finds that the plaintiffs have met the "probability of success" requirement under the liberal definition followed in the Tenth Circuit.

*Conclusion*

The plaintiffs have met the four prerequisites for issuance of a preliminary injunction. Therefore, the consent injunction already in place will be continued according to its present terms, with one exception. All proceeds, past or future, from the sale of the disputed cattle are ordered paid into the registry of this court pending the outcome of this litigation. The injunction will remain in place continuously until lifted by order of this court.

The court will leave the parties with one concluding observation. Judge Posner of the Seventh Circuit Court of Appeals has written:

> [T]he task for the district judge in deciding whether to grant or deny a motion for preliminary injunction is to minimize errors: the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose.

*Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 388 (7th Cir.1984). This is but another way of saying that the court must preserve its ability to render a meaningful decision on the merits. The court is mindful that this injunction may bring financial hardship to Boerdery, and the court is not unsympathetic. But with the injunction in place, the money will be there for its rightful owner when the case is resolved. The same cannot be said with any certainty if the alternative route is chosen. Thus the court attempts to minimize the errors, and ensure that justice can be ultimately be done.

The foregoing shall constitute the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

IT IS THEREFORE ORDERED that a preliminary injunction be entered, consistent with the terms of the prior consent injunction, but with the one exception that all proceeds from the sale of the cattle in dispute, both past and future, be paid into the registry of this court, said proceeds to be invested in an interest bearing account. *See* D.Kan. Rule 126. This injunction will remain in effect until this litigation is resolved or the injunction is lifted by order of the court.