(129 P.3d 609)
No. 93,526

STEVE HAMMER and RON HOWE, *Appellants*, v. KEVIN THOMPSON, ROGER MORRIS d/b/a MORRIS CATTLE COMPANY AND AUCTION SERVICE, NICK HUNT d/b/a CLAN FARMS, INC., IBP FOODS, INC., and FARM BUREAU MANAGEMENT CORPORATION d/b/a BIC CATTLE, *Appellees*.

Opinion filed March 3, 2006.

*Elizabeth A. Carson*, of Bruce, Bruce & Lehman, L.L.C., of Wichita, for appellants.

*M. Kathryn Webb* and *Donald H. Snook*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, for appellee Roger Morris d/b/a Morris Cattle Company and Auction Service, and *Brad LaForge*, of Hite, Fanning & Honeyman, of Wichita, for appellee Nick Hunt d/b/a Clan Farms, Inc.

*Jeffery A. Jordan*, of Foulston Siefkin, LLP, of Wichita, and *E. Lawrence Oldfield*, of Oldfield & Fox, P.C., of Oak Brook, Illinois, for appellees Farm Bureau Management Corp. d/b/a BIC Cattle and IBP Foods, Inc.

Before RULON, C.J., GREENE, J., and BRAZIL, S.J.

BRAZIL, J.: Steve Hammer and Ron Howe appeal the district court's decision to grant the summary judgment motions of Roger Morris d/b/a Morris Cattle Company and Auction Service (Morris), Nick Hunt d/b/a Clan Farms, Inc. (Hunt), IBP Foods, Inc., now known as Tyson Fresh Meats (Tyson), and Farm Bureau Management Corporation d/b/a BIC Cattle (BIC) in their action for conversion of cattle and the denial of the appellants' motion for partial summary judgment. The district court found that the entrustment doctrine pursuant to K.S.A. 84-2-403 protected these appellees. We affirm the court's denial of Hammer and Howe's motion for partial summary judgment and reverse and remand the summary judgment granted to the appellees.

Steve Hammer and Ron Howe filed a petition in chapter 61, limited actions, against Kevin Thompson, Morris, Hunt, and Tyson. The petition stated that Hammer and Howe placed 150 breeding heifers with Thompson for grazing on pasture land. Hammer and Howe alleged that Thompson transferred the cattle to Morris for $131,750, thus converting the cattle for Thompson's own use and purpose. Morris then transferred the cattle to Hunt who transferred the cattle to Tyson. Hammer and Howe alleged that all defendants were jointly and severally liable for the conversion of the cattle.

Tyson raised the affirmative defenses of the entrustment doctrine and buyer in the ordinary course of business in its answer. Tyson also cross-claimed against Hunt for indemnification.

In his answer, Morris admitted that he gave Thompson $83,188 for 150 head of cattle. Morris specifically denied that he converted the cattle. He claimed he was a buyer in the ordinary course of business and that Thompson was a merchant under the Uniform Commercial Code (UCC). Therefore, the entrustment doctrine barred the claims.

Thompson did not answer the petition, and a default judgment of $131,750 was entered against him.

Hammer and Howe filed an amended petition on January 29, 2004. BIC was added as a defendant. The petition alleged that Morris transferred the cattle to Hunt through BIC and that BIC also converted the cattle.

In his answer, Hunt raised the defense of the entrustment doctrine and buyer in the ordinary course of business. Hunt raised a cross-claim against BIC for indemnification. BIC also raised the defenses of entrustment and buyer in the ordinary course of business. BIC filed a cross-claim against Morris for indemnification.

BIC and Tyson filed a joint motion for summary judgment, arguing that they were protected from liability by the entrustment doctrine found in the UCC. Hunt filed a motion for summary judgment, incorporating BIC and Tyson's memorandum of law and requesting summary judgment pursuant to the entrustment doctrine. Morris also filed a motion for summary judgment based on the entrustment doctrine. Hammer and Howe moved for partial summary judgment against all defendants on the issue of liability.

The district court adopted the uncontroverted facts set forth by the moving defendants and concluded as a matter of law that the entrustment doctrine applied to the case. The district court found that Thompson was a merchant and that Morris was a buyer in the ordinary course of business pursuant to the entrustment doctrine. Therefore, Morris and all subsequent purchasers obtained and passed good title to the cattle. The district court granted the defendants' motions for summary judgment and denied Hammer and Howe's motion for partial summary judgment. The cross-claims were dismissed as moot.

Hammer and Howe timely appeal.

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citations omitted.]' " *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

The filing of cross-motions for summary judgment does not obligate a trial court to enter summary judgment. Rather, the trial

court must independently determine whether a genuine issue of material fact exists. 73 Am. Jur. 2d, Summary Judgment § 43, pp. 684-85.

*Hammer and Howe's motion for partial summary judgment*

We have jurisdiction to consider the denial of Hammer and Howe's own summary judgment motion because the district court granted the opposing parties' summary judgment motion. See *Southwest Nat'l Bank v. Simpson & Son, Inc.*, 14 Kan. App. 2d 763, 768, 799 P.2d 512 (1990), *rev. denied* 248 Kan. 997 (1991).

Hammer and Howe argue that they established conversion as a matter of law through the following uncontroverted facts: Thompson did not have title to the cattle; Morris bought the cattle from Thompson for the benefit of Hunt who used BIC as its agent to purchase the cattle; Hunt sold 142 of the 150 cattle to Tyson; and Hammer and Howe did not give authority to Thompson to sell the cattle on the date of sale. Hammer and Howe contend that although the entrustment doctrine provides an exception to the general rule that a thief cannot pass good title, the defendants had the burden to establish each element of their affirmative defense and failed to do so.

Conversion is defined as "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Moore v. State Bank of Burden*, 240 Kan. 382, 386, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987).

Hammer and Howe contend that the defendants were not authorized to exercise the right of ownership as a matter of law. In order to overcome the motion, the appellees must raise a genuine issue of material fact as to their authority to exercise ownership. Appellees argue that authority is provided by the UCC's entrustment doctrine.

There is no dispute between the parties that Article 2 of the UCC applies to this case.

Kansas statutes set forth the UCC entrustment doctrine, applicable in transactions of goods, as follows: "Any entrusting of possession of goods to a merchant who deals in goods of that kind

gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." K.S.A. 84-2-403(2). The statute also provides in part: " 'Entrusting' includes any delivery and any acquiescence in retention of possession . . . ." K.S.A. 84-2-403(3). Hammer and Howe do not dispute that they delivered possession of the cattle to Thompson.

Case law has defined three steps required for the doctrine to be applicable. "(1) An entrustment of goods to (2) a merchant who deals in goods of that kind followed by a sale by such merchant to (3) a buyer in the ordinary course of business." *Executive Financial Services, Inc. v. Pagel*, 238 Kan. 809, 816, 715 P.2d 381 (1986).

The parties' briefs do not point out that the UCC limits the definition of merchant under the entrustment doctrine to a person who "deals in goods of that kind" even though the definition of merchant in K.S.A. 84-2-104(1) includes those who are merchants because of their knowledge or skill peculiar to the goods involved in the transaction or who hold themselves out as having such knowledge and skill. See K.S.A. 84-2-403, Kansas Comment, 1996, subsection 4 ("Persons who are merchants because of their knowledge of business practices would not qualify under this subsection [entrustment].").

Hammer and Howe rely on the interpretation of the term "merchant" in *Decatur Cooperative Association v. Urban*, 219 Kan. 171, 547 P.2d 323 (1976), and *Musil v. Hendrich*, 6 Kan. App. 2d 196, 627 P.2d 367 (1981).

In *Decatur*, the Kansas Supreme Court reviewed the issue of whether a farmer was a merchant pursuant to the UCC in an action where a cooperative sought to obtain possession of wheat purchased under an oral contract with a farmer. If the farmer was a merchant, then the statute of frauds would not apply to the contract. 219 Kan. at 172, 176. The opinion found that under the UCC there are three criteria for determining merchant status:

"(1) a dealer who deals in goods of the kind involved, or (2) one who by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction, even though he may not actually have such knowledge, or (3) a principal who employs an agent, broker or other intermediary

who by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." 219 Kan. at 176.

The Supreme Court noted that "professionalism, special knowledge and commercial experience" are to be used in the determination. The court found that the farmer was not a merchant because he did not "deal" in wheat and because he did not have any knowledge or skill peculiar to the practices or goods involved in the transaction. Instead, the farmer had special knowledge in raising wheat. 219 Kan. at 177.

*Musil* relied on the *Decatur* criteria for determining merchant status in a case where the question was whether a hog farmer was a merchant under the UCC for the purpose of applying the implied warranty of merchantability. 6 Kan. App. 2d at 201. This court found that there was no doubt that the appellee was a dealer in hogs since he testified that he had been in the hog business for 30 to 40 years, and at the time of the sale at issue, was selling 50 to 100 pigs each month. 6 Kan. App. 2d at 202. This court also found that the appellee's testimony supported a finding that he was a merchant under the second *Decatur* criteria.

Morris distinguishes *Decatur* and *Musil*. However, the parties fail to recognize that the definition of merchant under the UCC entrustment doctrine is limited to a person who "deals in goods of that kind." It is this limitation that distinguishes *Decatur* and *Musil*, which do not interpret merchant solely based on "deals in goods of that kind."

In his brief, Morris says that the appellants concede that an order buyer can qualify as a "merchant"; however, the pleading referred to is a factual assertion that Morris "bought and sold cattle as a dealer in cattle on a regular basis." It does not appear that Hammer and Howe were conceding that Thompson is a merchant.

The parties indicate that Thompson was involved in order buying cattle. Thompson described order buying as acting as the middleman between the purchaser and the seller. "I buy the cattle for the man that's purchasing them and try to help the man that's selling them get rid of them or sell them."

In order to determine whether the appellees established that entrustment gave them ownership authority, the term "deals in

goods of that kind" needs to be interpreted. There are no published Kansas cases on this issue, and the parties did not reach this question since they relied on the broader definition of merchant.

"Deals in goods of that kind" entrusted has been construed as a person who is engaged regularly in selling or leasing goods of the kind. 3A Anderson on the Uniform Commercial Code § 2-403:80 (3d ed. 2002 rev.); see also *Toyomenka, Inc. v. Mount Hope Finishing Company*, 432 F.2d 722, 727-28 (4th Cir. 1970) (customs broker was not engaged regularly in selling goods of the kind); *Prenger v. Baker*, 542 N.W.2d 805, 808-09 (Iowa 1995) (farmer who raised and sold exotic animals for 6 years was regularly engaged in selling goods of the kind); *Canterra Petro., Inc. v. Western Drill. & Min.*, 418 N.W.2d 267, 271 (N.D. 1987) (relevant factual inquiry was whether the entrustee was regularly engaged in selling goods of the kind; conclusory statements in affidavits were not dispositive of the issue).

K.S.A. 47-1804(c) defines "livestock dealer" as

"any person engaged in the business of buying or selling livestock in commerce, either on that person's own account or as the employee or agent of the seller or purchaser, or any person engaged in the business of buying or selling livestock in commerce on a commission basis and shall include any person who buys or sells livestock with the use of a video. 'Livestock dealer' does not include any person who buys or sells livestock as part of that person's own breeding, feeding or dairy operation, nor any person who receives livestock exclusively for immediate slaughter."

The definition of a livestock dealer would encompass an "order buyer" as defined by Thompson, and an order buyer of cattle would arguably be a merchant who "deals in goods of that kind" under the entrustment statute.

We have found no Kansas cases on the question of whether an order buyer is considered a merchant under the entrustment doctrine. However, in *Heinrich v. Titus-Will Sales*, 73 Wash. App. 147, 153, 868 P.2d 169 (1994), the court found that it was not necessary for a party to possess an inventory in order to fit within the statutory definition of merchant for the purposes of the entrustment doctrine. 73 Wash. App. at 154. There, the broker/dealer of used cars failed to pay the seller for a vehicle which the broker/dealer sold

to a third party. The appellate court upheld the application of the entrustment doctrine and granted replevin of the vehicle to the third-party buyer. However, in reasoning that the broker/dealer was a merchant, the opinion noted that the definition of merchant includes one who holds himself or herself out as having knowledge or skill peculiar to the goods involved in the transaction and that the broker/dealer held himself out as a dealer in automobiles and appeared to be a dealer in automobiles. 73 Wash. App. at 154-55. To the extent that the court relied on the broader definition of merchant, the reasoning could be considered flawed.

In their brief, BIC and Tyson cite to *Cattle Finance Co. v. Boedery, Inc.*, 795 F. Supp. 362 (D. Kan. 1992), as a case involving similar facts to the present case and decided under Kansas law. In *Cattle Finance*, the defendant was an Iowa corporation in the business of buying and selling cattle. The defendant shipped cattle to a Kansas feedlot. The manager of the feedlot sold the cattle to the debtors of the plaintiff finance company and kept the proceeds for himself, keeping two sets of books on the ownership of the cattle. The defendant opposed a preliminary injunction to escrow the proceeds from the sale of the cattle. The federal court determined that there was a fair ground for litigation under the UCC entrustment doctrine and issued a preliminary injunction.

BIC and Tyson assert that the federal court upheld the superior title of the plaintiff debtors over the defendant who entrusted the cattle to the feedlot. However, the federal court made it clear that its decision was based on the plaintiff's production of evidence in support of its claims, demonstrating a fair ground for litigation on the issue. It was not a determination on the merits. 795 F. Supp. at 366 n.2.

The *Cattle Finance* opinion also discussed the manager of the feedlot's status as a merchant under the entrustment doctrine. The feedlot manager would solicit buyers for cattle and broker deals with the defendant or purchase cattle in the name of the feedlot for retransfer to the purchasers. The federal court noted that this practice was well known to the plaintiffs and defendant at the time and the practice showed that the feedlot manager was a merchant who dealt in goods of the kind entrusted. 795 F. Supp. at 366.

However, as stated above, this was not a determination on the merits of whether the merchant element was met for the purposes of the entrustment doctrine.

To support their argument that Thompson was not a merchant, Hammer and Howe argue that Thompson had no intention of being an order buyer of cattle; his intent was only to run growing lots. Hammer and Howe contend there is no evidence that Thompson was running an order buying business in May 2002 when he sold the Hammer/Howe cattle and, therefore, he was not dealing in goods of the kind. Hammer and Howe assert that Thompson's documented sales were in the months of October and November 2002, after the May 2002 sale of Hammer and Howe's cattle to Morris.

Morris argues that Thompson was a merchant, pointing to the following facts: Thompson began an order buying business while working at Greeley Farms, and Hammer sold Thompson 300 head of cattle earlier in the summer. Thompson held himself out as a person with specialized knowledge of pasturing cattle, Thompson had documented purchases and sales of cattle as early as March 2001 and had bought or sold cattle as an order buyer in at least 60 different transactions.

BIC and Tyson argue that the fact Thompson sold and purchased cattle before and after the sale in the present case and the fact the other transactions involved multiple persons and/or business entities, as well as Thompson's testimony about acting as order buyer and cattle trader, show that Thompson was a merchant.

BIC and Tyson provided the district court with 18 exhibits in their motion for summary judgment. Among the exhibits was an excerpt of Thompson's deposition. Thompson testified that he managed a ranch in Greeley, Kansas, from 1996 to 2001. In 2001, Thompson moved to Richmond, Kansas, to "start the cattle business for myself. I was running a starting lot and trying to order buy cattle and trade cattle." He began order buying when he was still working at the ranch in Greeley in 2000. Thompson testified that he did most of his order buying in 2001-02.

The exhibits also included two charts that list the dates and transaction information for Thompson's cattle sales and purchases in

2002. It appears from the chart of cattle sales that there were eight transactions between October 16, 2002, and November 19, 2002, while the chart of cattle purchases shows there were 18 transactions between October 9, 2002, and November 21, 2002.

Appellee Morris sold cattle to Thompson in the 19 transactions which were dated between May 15, 2002, and August 18, 2002.

In BIC and Tyson's response to Hammer and Howe's motion for partial summary judgment, one of the attached exhibits included an affidavit from Thompson that stated the attached were true and correct documents from his cattle business in 2001.

The attached invoices clearly showed Thompson was involved in 31 transactions between March 15, 2001, and December 20, 2001. There were 25 invoices where Thompson was listed as the buyer and 6 where Thompson was listed as the seller.

Through the above evidence, the appellees showed that there was a material dispute as to the question of whether Thompson was a merchant for the purposes of the entrustment doctrine. We will address the district court's decision that Thompson was a merchant as a matter of law in the second issue. The next question is whether the appellees raised a material dispute as to the buyer in the ordinary course of business element from the entrustment doctrine.

The definition of "buyer in the ordinary course of business" is not limited by the entrustment doctrine. K.S.A. 84-2-403, Kansas Comment, 1996, subsection 4. The UCC defines buyer in the ordinary course of business in relevant part as "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker in the business of selling goods of that kind." K.S.A. 2005 Supp. 84-1-201(9). Under Article 2 of the UCC, a merchant is subject to a higher standard for good faith: "[I]n the case of a merchant [good faith] means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." K.S.A. 2005 Supp. 84-2-103(1)(b). When the buyer is a merchant, the buyer must meet the higher standard for good faith. 3A Anderson on the Uniform Commercial Code § 2-403:34-35.

Hammer and Howe do not contend that Morris had actual knowledge of their ownership rights. Hammer and Howe also concede that Morris has sufficient evidence on the subjective element of good faith—honesty in fact. However, they claim that Morris failed to come forward with material evidence of the objective element of good faith—the observance of reasonable commercial standards. Hammer and Howe point out that the Kansas Comment to K.S.A. 2005 Supp. 84-2-103, subsection 3 states: "Usage of trade, course of dealing, and course of performance are relevant in establishing reasonable commercial standards." Because course of dealing and course of performance are not applicable under the facts of the transaction at issue, Hammer and Howe argue that Morris must rely on proof of trade usage to establish that he observed reasonable commercial standards of fair dealing.

Morris argues that Hammer and Howe do not offer any support for their assertion that the appellees needed to show objective good faith through course of dealing. Article 1 of the UCC provides the general definitions for the Code. The definitions are prefaced by the following language: *"Subject to additional definitions* contained in the subsequent articles of this act which are applicable to specific articles or parts thereof, and unless the context otherwise requires . . . ." (Emphasis added.) K.S.A. 2005 Supp. 84-1-201.

Under Article 1, good faith is defined as "honesty in fact in the conduct or transaction concerned." K.S.A. 2005 Supp. 84-1-201(19). At oral argument, the appellees pointed out that the 1996 Kansas Comment states: "The definition of 'buyer in ordinary course of business' is a specialized version of the traditional concept of bona fide purchaser, purchasing from one who deals in goods of that kind. 'Good faith' is defined in subsection (19) of this section." K.S.A. 84-1-201, Kansas Comment, 1996, subsection 9.

Therefore, the subjective good faith standard is applicable to a buyer in the ordinary course of business, in general. However, the Comment goes on to state:

"The definition of 'good faith' in this subsection is subjective, and requires only honesty in fact. . . . In Articles 2 and 2a, the definition of 'good faith' is expanded to include an objective standard of 'reasonable commercial standards of fair deal-

ing in the trade' when the party involved is a merchant." K.S.A. 84-1-201, Kansas Comment, 1996, subsection 19.

Article 2 provides the following definition of good faith: " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." K.S.A. 2005 Supp. 84-2-103(1)(b). Therefore, whenever a merchant is involved in a case under Article 2, the merchant is subject to both the objective and the subjective standard of good faith. The entrustment provision is found in Article 2, at K.S.A. 84-2-403(3). Further support for the application of the expanded standard is found in the 1996 Kansas Comment to 84-2-103:

"Paragraph (1)(b) defines 'good faith' as applied to merchants (defined in 84-2-104) under Article 2 as containing both a subjective standard ('honest in fact') as well as an additional objective standard of the observance of reasonable commercial standards of fair dealing in the trade. Usage of trade, course of dealing, and course of performance are relevant in establishing reasonable commercial standards. . . . The general Code definition of 'good faith' is limited to subjective honesty in fact, and applies to non-merchants under Article 2." K.S.A. 84-2-103, Kansas Comment, 1996, subsection 3.

See also 3A Anderson on the Uniform Commercial Code § 2-403:34 ("When the buyer is a merchant, the buyer must meet the requirements of goods UCC § 2-103[1][b] which require both honesty in fact and observance of 'reasonable commercial standards of fair dealings.' When the buyer is not a merchant the subjective test of good faith found in UCC § 1-201[19] applies.").

The appellees also argue that this court should rely on *Executive Financial Services, Inc. v. Pagel*, 238 Kan. 809, 715 P.2d 381 (1986). There, the Kansas Supreme Court quoted the definition of "buyer in the ordinary course of business" from the Article 1 definitions section. The opinion then quoted the subjective definition of good faith from Article 1. 238 Kan. at 817-18.

It seems the appellees are arguing that the Supreme Court determined that the subjective standard of good faith applies to a buyer in the ordinary course. However, the Supreme Court did not address the question of whether the buyer was a merchant or discuss the appropriate standard of good faith. The *Pagel* issue was whether the transaction met the definition of "buying" as found in

the "buyer in the ordinary course of business" definition. 238 Kan. at 818. The *Pagel* court did not address the same issue that is raised in the present case—whether a buyer in the ordinary course of business, who is also a merchant, is subject to the Article 2 definition of good faith.

Finally, the appellees argued that there is a split in the jurisdictions as to what standard of good faith applies to a buyer in the ordinary course of business. We did not find anything in our research indicating that there is such a split for Article 2 cases.

However, there are conflicting decisions in other UCC cases. See 1 Anderson on the Uniform Commercial Code § 1-201:88 ("Courts do not seem to be consistent in determining whether a merchant buyer has the duties to observe reasonable commercial standards of the trade.").

The two cases annotated by the treatise were cases that involved Article 9. *Sea Harvest, Inc. v. Rig & Crane Equip. Corp.*, 181 N.J. Super. 40, 49-50, 436 A.2d 553 (1981), determined that the merchant good faith standard from Article 2 is not applicable in Article 9 cases because it found the Article 2 definitions did not control the other UCC articles unless the context otherwise required. *Sherrock v. Commercial Credit Corporation*, 277 A.2d 708, 713 (Del. Super. 1971), *rev'd on other grounds* 290 A.2d 648 (Del. 1972), found that the merchant buyer had to meet the subjective and objective standards of good faith in an Article 9 case. See also *Sherrock v. Commercial Credit Corporation*, 269 A.2d 407, 408 (Del. Super. 1970) (a merchant buyer would be subject to two different standards if the Article 2 standard of good faith were not applied to merchant buyers in Article 9 transactions).

In summary, the Article 2 standard of good faith applies in the current case since there is no dispute that Morris is a merchant.

Hammer and Howe argue that Morris did not establish observance of reasonable commercial standards through trade usage. Morris does not otherwise provide any argument as to the facts in evidence supporting Morris' observance of reasonable commercial standards. Morris also contends that course of performance, course of dealing, and usage of trade are only useful in evaluating good faith when interpreting a contract.

BIC and Tyson seem to acknowledge that Morris is subject to the higher standard of good faith for merchants. They argue that there is no requirement for expert testimony to establish that reasonable commercial standards have been met.

There are no Kansas cases to provide guidance on the determination of whether a merchant has observed reasonable commercial standards. In *Cugnini v. Reynolds Cattle Co.*, 687 P.2d 962 (Colo. 1984), the appellate court found that a buyer in the ordinary course of business met the higher good faith standard. There, the plaintiffs sold cattle to an individual who was in the business of buying and selling cattle. Per the buyer's instruction, the plaintiffs shipped the cattle to a feedlot even though the buyer had not paid for the cattle. The buyer failed to pay the plaintiffs for the cattle. Nevertheless, the buyer sold the cattle to the defendant cattle company, which paid for the cattle and took possession of them. The plaintiff sued to recover the cattle and for damages.

Among their arguments, the *Cugnini* plaintiffs claimed that the defendant cattle company was not a buyer in the ordinary course of business because it did not observe reasonable commercial standards of fair dealing in the cattle trade. The plaintiffs specifically pointed to a failure to acquire a brand inspection certificate and to accepting an inadequate bill of sale as violating the standards. The Colorado Supreme Court reviewed the trial court's findings of fact concerning whether reasonable commercial standards were met and affirmed the trial court's finding that the standards were reasonable and had been met. The Colorado Supreme Court did not set forth any rules in manner of proof but did note that the trial court's findings were supported by testimony in the record from various cattle merchants. 687 P.2d at 968.

In *Touch of Class v. Mercedes-Benz*, 248 N.J. Super. 426, 443, 591 A.2d 661 (1991), the New Jersey appellate court found that a merchant was not a buyer in the ordinary course of business because he did not meet the higher good faith standard. There, the Canadian defendant entered into a car lease with an individual lessee in Canada. The lessee fraudulently sold the car to a New York automobile wholesaler and retail dealer who then sold the car to another individual. The car was then transferred to a leasing

agent. After the car was impounded, the New York wholesaler, leasing agent, and individual buyer filed suit, claiming that the leasing agent had title to the car.

The New Jersey Superior Court found that the New York wholesaler failed to observe reasonable commercial standards in its dealings with the lessee. Specifically, the court found that it was unreasonable for the merchant to fail to inquire how to assure purchasers of receiving good title when purchasing from a nontitle jurisdiction since the automobile wholesaler rarely bought vehicles from Canada. The opinion referred to testimony of the president of the automobile wholesaler and the statutes in New Jersey and Canada concerning the purchase of and passing good title to vehicles. It does not appear that there was any other evidence introduced to establish reasonable commercial standards of fair dealings in the trade.

In BIC and Tyson's opposition to Hammer and Howe's partial summary judgment motion, the appellees argued that there was no need for expert testimony on what reasonable commercial standards are for the purchase of cattle. They contended that there was nothing out of the ordinary about the fact that Thompson sold cattle and Morris bought the cattle. Hammer and Howe had argued that the transaction in this case was suspicious because a check that Thompson wrote to Morris on May 15 bounced, which was 3 days before the sale to Morris in this case. In other words, Morris should have known that there was something suspicious about Thompson. BIC and Tyson countered that Thompson's check to Morris cleared when Morris put it through the bank a second time.

As evidence that Morris was paid, BIC and Tyson attached an excerpt of Thompson's deposition where he said he did not owe Hammer or Hunt any money. Also attached were two bank statements for Morris Cattle Company. There is an affidavit in the record by Morris where he said that the first check was returned for insufficient funds on May 20 and Morris resubmitted the check and it cleared on May 29. The record shows that at the time Morris purchased the cattle at issue in the case, he did not know there was a problem with Thompson's check.

An excerpt of Morris' deposition shows that Morris' friend told him about Thompson. Morris was told that Thompson "moves quite a few cattle over there." Morris had been trying to find a place to sell cattle. Morris then made contact with Thompson and offered to do business with him. At some point, Thompson contacted Morris and purchased some cattle.

Morris testified that Thompson called to ask if Morris could sell 150 black heifers. Morris asked Thompson to describe them, and Thompson said they were good heifers from the north. Morris said that Thompson said the heifers were his and that he had decided to sell the heifers rather than make cows of them. Morris, who is located in Arkansas, had his truck driver look at the heifers and also asked a friend who lives in Kansas to look at them. After the truck driver and friend reported the heifers were good, Morris offered 70 cents per pound for the cattle. Morris was not sure if his friend had made a special trip to see the heifers or if he had just seen the cattle because he lived in the area. After agreeing to purchase the cattle from Thompson, Morris then called Hunt and offered the heifers to him. Morris testified that he never saw the heifers and they went directly to Hunt's farm in Iowa. Hammer and Howe do not contend that Morris is incorrect about how the cattle purchase was conducted.

In Hunt's response to the partial summary judgment motion, Hunt argued that Morris provided sufficient evidence to establish his compliance with reasonable commercial standards. Hunt claims that testimony from Hunt and Morris shows that the transaction was typical and that Hunt and Morris have extensive cattle trading experience.

The excerpt of Hunt's deposition shows that Hunt testified that he had about 10 different cattle deals with Morris over the course of 20 years. Hunt said that he never had a transaction like the one in this case. Hunt testified that what was different about the transaction was that Morris was selling him cattle that were not located in his area. Hunt also testified as to the nature of his own normal buying transaction for feeding cattle.

Hunt attached an affidavit from Morris to his response. The affidavit stated that Morris had been in the cattle business for 32

years and that in his business as an order buyer, he locates farmers and ranchers who have cattle to sell, buys the cattle, and resells them. The affidavit said that it was not unusual to buy and sell cattle from someone who he did not know and that there was nothing unusual about the transactions between Thompson and Morris.

Hunt offered in his response that all of the defendants were experienced in the area of cattle trading and each can offer testimony as to what is commercially reasonable. However, that testimony was not prepared for the response to the partial summary judgment motion.

In Morris' response, he did not offer any additional evidence showing that he followed reasonable commercial standards. However, he did incorporate his arguments and authorities from his motion for summary judgment. In Morris' summary judgment motion, Morris contended that he observed reasonable commercial practices when he negotiated the purchase because he asked several questions about the heifers, had two people look at the heifers before the purchase, and offered what he testified was a fair market value.

It appears that the appellees did come forward with evidence that established there was at least a dispute as to Morris' status as a buyer in the ordinary course of business sufficient to overcome Hammer and Howe's motion for partial summary judgment, based on the exhibits attached to their motions and the record developed through the cross-summary judgment motions. Hammer and Howe's contention that there was no evidence to show Morris observed reasonable commercial standards is more appropriately dealt with in the next issue concerning whether the district court erred in finding that Morris was a buyer in the ordinary course of business as a matter of law. The pleadings, depositions, and affidavits show that there was a genuine issue as to whether the appellees had authority through the entrustment doctrine to exercise ownership over the cattle. The district court did not err in denying Hammer and Howe's motion for partial summary judgment on the issue of liability.

### *Appellees' motion for summary judgment*

Hammer and Howe argue that the district court failed to apply

the proper summary judgment standard of resolving the facts and inferences in favor of the party against whom the motion is made when granting the appellees' summary judgment motion. Hammer and Howe contend that they offered evidence disputing the material fact that Morris and subsequent buyers were buyers in the ordinary course of business and that Thompson was a merchant.

### Status as a merchant

Hammer and Howe argue that the district court erred in finding that Thompson was a merchant as a matter of law. They point out in their brief that whether a person is a merchant is a question for the trier of fact and the issue becomes one of law only if reasonable minds could not draw different conclusions from the facts (citing *Colorado-Kansas Grain Co. v. Reifschneider*, 817 P.2d 637, 640 [Colo. App. 1991]). Hammer and Howe argue that reasonable minds could differ as to whether Thompson was a merchant.

Summary judgment is proper where the only questions presented are questions of law. *Fletcher v. Nelson*, 253 Kan. 389, 391, 855 P.2d 940 (1993).

There are no published Kansas opinions that address whether the question of a party's status as a merchant under the UCC is a question of law or fact. In *Executive Financial Services, Inc.*, 238 Kan. at 816, the Kansas Supreme Court affirmed a district court's grant of a defendant's summary judgment motion based on the entrustment doctrine without any discussion as to whether a party's status as a merchant was a question of law or fact. 238 Kan. at 813-19. The Supreme Court reviewed the party's status as a merchant.

Some courts find that whether a person is a merchant under the UCC is a question of fact. *Prenger v. Baker*, 542 N.W.2d 805, 808 (Iowa 1995) ("[W]hether a party to a transaction is a merchant is a question of fact."); *Touch of Class v. Mercedes-Benz*, 248 N.J. Super. 426 (status as a merchant is determined according to circumstances of each case).

It has also been held that the status of a person as a merchant is a question of law for the courts to decide by applying the UCC definition of merchant to the facts of the case. See *Cudahy Foods Company v. Holloway*, 55 N.C. App. 626, 629, 286 S.E.2d 606

(1982); *Miller v. Badgley*, 51 Wash. App. 285, 291, 753 P.2d 530 (1988).

One court held that it is a mixed question of law and fact. *Vince v. Broome*, 443 So. 2d 23, 28 (Miss. 1983); see 2 Anderson on the Uniform Commercial Code § 2-104:18-19 (3d ed. 2004 rev.).

We agree with those authorities which find the status of merchant is a mixed question of law and fact. Whether there exist circumstances to constitute merchant status is a question of fact. But whether those facts that are determined constitute a person as a merchant is a question of law.

Assuming the question of status as a merchant is initially a question of fact, if there are no disputed material facts, then the issue of whether a party is a merchant under the UCC becomes a question of law and appropriate for summary judgment. See *City of Topeka v. Watertower Place Dev. Group*, 265 Kan. 148, 154, 959 P.2d 894 (1998) (when there were no disputed facts and there was no other factfinding necessary, the question of whether a contract was breached was a matter of law).

There are three general policies supporting the UCC entrustment provision. First, it protects the innocent buyer who believes the merchant has legal title to the goods because the goods are in the merchant's possession. Second, the entrustment provision is also based on the rationale that the entruster is in a better position than the innocent buyer to protect against the risk of the dishonesty of the dealer. Third, entrustment facilitates the flow of commerce when buyers in the ordinary course of business are involved. See *Heinrich v. Titus-Will Sales, Inc.*, 73 Wash. App. 147, 153, 868 P.2d 169 (1994); 3A Anderson on the Uniform Commercial Code § 2-403:75.

Among the 26 exhibits attached to the motion for partial summary judgment, Hammer and Howe included an excerpt of Thompson's deposition where Thompson said that he did not want to order buy or trade cattle when he left Greeley's ranch. He only wanted to run growing lots. Thompson started order buying because he did not have any income from starting calves.

The evidence concerning Thompson's status as a merchant included invoices that Thompson attested were from his cattle busi-

ness for calendar year 2001. Between March 15, 2001, and December 20, 2001, there were 25 transactions where Thompson was the buyer and 6 where Thompson was the seller. Additionally, Thompson confirmed at his deposition that charts prepared for the litigation represented his cattle sales and purchases for calendar year 2002. Between October 9, 2002, and November 21, 2002, Thompson was involved in at least one sale and at least 15 purchases as shown by his name listed on the invoices. There were additional invoices in the record where Thompson purchased cattle from Morris in 19 transactions between May 15, 2002, and August 18, 2002.

In the sale at issue, Thompson sold the cattle to Morris on May 18, 2002. There is a lapse in time between December 2001 and May 2002 where there are no records to support that Thompson was involved in order buying cattle. This is consistent with Thompson's testimony that his initial intention was to run growing lots when he moved to Richmond but that he began order buying because he did not have any income. Even if we find that the question of whether a party is a merchant is a question of fact, the undisputed facts in the record support a finding that as a matter of law, Thompson was a merchant who dealt with goods of the kind. The cases we mentioned in the first issue construed a person who deals in goods of the kind as a person who is engaged regularly in selling goods of the kind. However, where an individual is acting as a middleman in the cattle trade, the issue is whether the party is regularly involved in transactions instead of only sales.

Hammer and Howe seem to contend that the low number of sales, instead of purchases, show that Thompson is not a merchant. Even when resolving inferences in favor of Hammer and Howe, Thompson's few months during which he did not conduct order buying do not negate the numerous deals that show he was a merchant. Hammer and Howe do not take the position that Thompson was not an order buyer for those transactions/invoices that are in the record.

The court did not err in finding that Thompson was a merchant as a matter of law.

## *Buyers in the ordinary course of business*

The next question is whether the court erred in finding as a matter of law that Morris was a buyer in the ordinary course of business. As stated earlier, Hammer and Howe only contend that the appellees have not shown that Morris observed reasonable commercial standards and, therefore, cannot show that he acted in good faith as required of a buyer in the ordinary course of business.

Hammer and Howe argued that the transaction was not within the norm because the buyer weighed the cattle instead of the seller. An excerpt of Hunt's deposition confirms that the cattle were weighed on a scale near Hunt's farm. Morris testified in his deposition that in most transactions, he weighs the cattle at the closest scale to the seller, and he goes to the location of the scale. However, Morris went on to explain why the cattle were not weighed near Thompson's place, but that portion of the deposition was not included in the record.

Hammer and Howe also submitted an excerpt of Hunt's deposition where he said that he paid "a little below market value" for the heifers. But he also said that he "always like[s] to buy cattle below the market."

Finally, Hammer and Howe point out that Morris did not plan to provide an expert witness to discuss the industry standards for cattle sales, as shown by Morris' notice regarding expert witness testimony. Hammer and Howe claim that Morris' "self-serving" testimony about industry standards is inadequate to establish industry standards as a matter of law. They argue that whether a buyer qualifies as a buyer in the ordinary course of business is an issue of fact that typically cannot be resolved on a motion for summary judgment (citing *Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing*, 119 Cal. App. 4th 1038, 15 Cal. Rptr. 3d 70 [2004]).

The defendants/appellees do not address whether the determination of a buyer in the ordinary course of business is a question of law or fact.

*Brasher*, cited by Hammer and Howe, found that the issue of whether a merchant observed a commercially reasonable standard

was a question of fact. 119 Cal. App. 4th at 1059; see also *Ledbetter v. Darwin Dobbs Co., Inc.*, 473 So. 2d 197, 201 (Ala. Civ. App. 1985) (whether a merchant acts in good faith is generally a jury question).

Under Article 3 of the UCC, this court found that whether a bank acted in a commercially reasonable manner was a question of fact. *Aetna Casualty and Surety Co. v. Hepler State Bank*, 6 Kan. App. 2d 543, 551, 630 P.2d 721 (1981).

From the evidence in the record, we conclude there is a genuine issue of material fact as to whether Morris was a buyer in the ordinary course of business because of the lack of evidence showing that Morris observed reasonable commercial standards of fair dealing in the cattle trade. Basically, Morris says that he followed reasonable standards because his own testimony shows that the transaction was normal. BIC and Tyson argue that there was no testimony showing that there was anything out of the ordinary about the transaction. However, there were no depositions or affidavits in evidence that showed the commercial standards in a typical transaction.

As the appellees argued, there is no authority requiring expert testimony to establish reasonable commercial standards have been met. However, the UCC says that usage of the trade is relevant, not the only means, to show reasonable commercial standards. Of the cases that Hammer and Howe rely on, only *Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279 (10th Cir. 1977), is a UCC case. However, the issue was whether an arbitration clause was a material alteration of a contract. There, the federal court said that a party must usually call on an expert to prove trade usage. 126 F.3d at 1285 n.15.

In *Cugnini v. Reynolds Cattle Co.*, 687 P.2d 962 (Colo. 1984), various cattle merchants testified as to the standards of fair dealing. However, in the present case there was not any testimony as to the standards of fair dealing in the trade. On remand, appellees should be required to provide evidence of standards of fair dealing by cattle merchants or other persons with the requisite knowledge or experience. In order for the appellees to show that they did not convert the cattle, they need to show that they had authority

through the entrustment doctrine. On their summary judgment motion, the appellees do not show that they are entitled to judgment as a matter of law because they have not shown that they are buyers in the ordinary course of business as a matter of law, an essential element of the entrustment doctrine.

### Subsequent buyers

Hammer and Howe's last point is that the district court erred in finding the entrustment doctrine protected the subsequent buyers, BIC, Hunt, and Tyson, before the court determined that Morris was a buyer in the ordinary course of business.

The sale by the entrustee transfers the entruster's title to a buyer in the ordinary course of business. K.S.A. 84-2-403(2). Once a buyer in the ordinary course of business acquires title by the entrustment doctrine, subsequent purchasers benefit by the buyer's title regardless of whether the subsequent purchasers would qualify as buyers in the ordinary course of business. See 3A Anderson on the Uniform Commercial Code § 2-403:128-29. Therefore, appellees need only establish the status of Morris, the first purchaser from Thompson, as a buyer in the ordinary course of business.

BIC and Tyson argue that all subsequent purchasers were buyers in the ordinary course of business. As stated earlier, subsequent purchasers benefit by the first buyer's title. Therefore, if Morris, the first buyer, is not a buyer in the ordinary course of business, then he could not pass good title to subsequent purchasers. In the context of the court's ruling, its finding that the subsequent purchasers were not liable was not erroneous. The district court erred in finding as a matter of law that Morris was a buyer in the ordinary course of business. Thus, it also erred in absolving the subsequent purchasers of liability. Hammer and Howe are correct that the court first needed to determine the nature of the title that Morris had to transfer.

Denial of plaintiff's motion for partial summary judgment is affirmed. Grant of summary judgment to appellees is reversed and remanded.